# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

---

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MICHAEL A. STEVENS, JR., | ) | |
| KRISTY L. STEVENS, | ) | |
| | ) | Case No. 21-50219-SCS |
| *Debtors.* | ) | |
| | ) | |
| TINA ESPY, | ) | |
| | ) | APN 21-05003-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL A. STEVENS, JR., | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |

---

## MEMORANDUM OPINION

This matter came before the Court for trial on February 16, 2022 (the "Trial"), upon the Complaint to Determine Dischargeability of Debt filed on June 7, 2021, by the Plaintiff, Tina Espy ("Ms. Espy"), by counsel, and the Answer thereto timely filed on July 8, 2021, by the Defendant, Michael A. Stevens, Jr. ("Mr. Stevens"), by counsel. The parties and their respective counsel appeared at the Trial and presented their evidence and arguments. At the conclusion of the Trial, the Court took the matter under advisement. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. PROCEDURAL HISTORY

Michael A. Stevens, Jr., and Kristy L. Stevens (collectively, the "Debtors"), by counsel, filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code on March 17, 2021. David R. Ruby, Esquire, was appointed to serve as the Chapter 7 Trustee. The Debtors each received their Chapter 7 discharge on June 30, 2021.

### A. The Complaint

On June 7, 2021, Ms. Espy, by counsel, timely filed the Complaint to determine dischargeability of debt owed to her by Mr. Stevens. Adv. Proc. No. 21-05003-SCS, ECF No. 1 (hereinafter, "Complaint").[1] The Complaint contains no express counts but seeks exception to discharge on the basis of false pretenses, false representations, and actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A). *Id*. at 1, 4-5. The Complaint also alludes to violations of the Virginia Consumer Protection Act. *Id*. at 4, 6.

Ms. Espy alleges that she obtained a quote for $12,000.00 from Mr. Stevens in June 2020 to convert her garage into a bedroom suite. *Id*. at 2. Ms. Espy believed the quoted price included all labor and materials to construct a floor in the garage equal in level to that of the rest of her home; install flooring, drywall, siding, lighting, and electrical items; and replace the garage door with a wall and window. *Id*. at 2-3. Ms. Espy paid a deposit of $7,640.00 on June 29, 2020, and one week later paid Mr. Stevens $1,300.00 to purchase flooring, which was delivered to her home. *Id*. at 3. Ms. Espy also separately paid an electrician $800.00, even though she thought this work was included in the initial $12,000.00 quote. *Id*. Ms. Espy apparently also wanted a half bathroom

---

[1] Unless otherwise noted, all future references to the docket refer to Adversary Proceeding Number 21-05003-SCS, which was initiated by Ms. Espy's Complaint.

installed in the space, which Mr. Stevens quoted her an additional $3,725.00 to complete beyond the initial amount quoted. *Id*.

Ms. Espy asserts that approximately two weeks into the project, she discovered Mr. Stevens had not obtained a permit for the project from the City of Hampton, Virginia. *Id*. The next day, when Mr. Stevens demanded additional payment of $5,625.00, she terminated their agreement because she believed Mr. Stevens was engaging in fraudulent behavior. *Id.* at 3-4. Ms. Espy alleges Mr. Stevens took building materials that she purchased with him when he was terminated, thus converting them. *Id*. at 5. Ms. Espy contends that the work Mr. Stevens performed neither complied with city code requirements and building standards nor was it completed to her satisfaction. *Id*.

According to Ms. Espy, she did not receive a written document memorializing her agreement with Mr. Stevens; as a result, she did not understand the scope of work to be performed or the work for which Mr. Stevens demanded payment following the initial deposit and flooring outlays. *Id*. at 3-4. Ms. Espy claims she relied on Mr. Stevens's false representations on his business card and Facebook page that he was an insured and licensed contractor and that such representations fraudulently induced her to hire him. *Id*. at 2, 4. Ms. Espy subsequently learned Mr. Stevens was not "appropriately licensed," and thus he would have been unable to secure a proper permit for the work at her home. *Id*. at 4. Ms. Espy claims that Mr. Stevens had previously held an appropriate contractor's license with the Commonwealth of Virginia, leading her to conclude that he understood the requirement to possess such license. *Id*. at 4, 6.

Ms. Espy obtained a judgment against Mr. Stevens from the General District Court for the City of Hampton, Virginia on January 14, 2021, for $25,000.00 in damages, $76.00 in costs, and $6,250.00 in attorney fees, all accruing 6.00% interest from the judgment date. *Id*. at 2. The

Complaint requests that the debt arising from this judgment be deemed nondischargeable under 11
U.S.C. § 523(a)(2)(A).  *Id*. at 6.

The Clerk of Court issued a Summons and Notice of Pretrial Conference, as well as an
Initial Scheduling Order, on June 9, 2021, setting a responsive pleading deadline of July 9, 2021,
and scheduling an Initial Pretrial Conference for August 8, 2021.  ECF No. 4.[2]  Counsel for Ms.
Espy filed a Motion to Continue the Pretrial Conference on June 30, 2021, and a corrected motion
on July 6, 2021.  ECF Nos. 11, 14.  The Court granted the corrected Motion to Continue by order
entered on July 27, 2021.  ECF No. 20.  The Clerk of Court issued an Alias Summons on July 27,
2021, rescheduling the Initial Pretrial Conference to October 1, 2021, at 9:30 a.m.  ECF No. 21.

### B.  The Answer

Mr. Stevens, by counsel, filed his Answer to the Complaint (the "Answer") timely on July
8, 2021.  ECF No. 18 (hereinafter, "Answer").  The Answer fails, generally, to admit or deny each
of the allegations asserted in the Complaint, as required by Federal Rule of Civil Procedure 8(b)(1),
as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7008.  Mr. Stevens does
specifically deny Ms. Espy's allegations that he engaged in false pretenses; made false
representations regarding the work requested by Ms. Espy; and committed actual fraud.  *Id*. at 1-
2.  He further denies that he intended to deceive Ms. Espy and that his work was of an inadequate
quality.  *Id*. at 2.

Mr. Stevens admits that Ms. Espy obtained judgment in state court against him, elaborating
that such judgment was obtained by default.  *Id.* at 1.  Mr. Stevens confirms that he "performed
certain home improvement work" as requested by Ms. Espy but fails to describe either specific or

---

[2] A Corrected Summons and Notice of Pretrial Conference was issued on June 9, 2021, maintaining
the same pleading deadline and Initial Pretrial Conference date.  ECF No. 7.

general tasks. *Id*. at 2. Mr. Stevens believed Ms. Espy was satisfied with his work, and once the project was underway, she requested additional tasks to be performed. *Id*. When Mr. Stevens requested payment toward the work performed, Ms. Espy did not have the funds to pay him. *Id*. Mr. Stevens represents that he intended to complete the desired work until Ms. Espy informed him of her inability to pay. *Id*.

### C.  Pretrial Conference

The Court conducted the Initial Pretrial Conference on October 1, 2021, at which counsel for both parties appeared. ECF No. 22. The parties requested approximately eight weeks for discovery and contemplated a single day trial. The Court established February 16, 2022, as the trial date. *Id*. The Court issued a Pretrial Order on October 1, 2021, setting discovery and motions deadlines of January 18, 2022, and indicating that the February 16, 2022 trial would be conducted via the ZoomGov platform. ECF No. 24.[3]

### D.  Discovery Issues

Counsel for Mr. Stevens issued interrogatories and a request for the production of documents on October 1, 2021, to which counsel for Ms. Espy filed a response on October 28, 2021.[4] ECF Nos. 23, 25. Counsel for Ms. Espy then issued requests for admission, as well as interrogatories and requests for the production of documents, on December 8, 2021.[5] ECF Nos. 26-27. Ms. Espy received no responses to her discovery requests, and her counsel filed a Motion to Compel on January 28, 2022, in which she sought to have the unanswered requests for admission

---

[3] An Amended Pretrial Order was issued on January 4, 2022, to correct the weblink to Norfolk and Newport News Amended Standing Order 20-4, which amended standing order was entered on December 23, 2021.

[4] Counsel for the parties filed the discovery requests and response thereto with the Court despite the clear admonition of Local Bankruptcy Rule 7026-1(M) to refrain from so doing, absent permission from the Court. The Court granted no such permission to the parties here.

[5] Again, these discovery materials were filed with the Court without express permission to do so.

deemed admitted and to compel Mr. Stevens's responses to the remaining propounded discovery.

ECF No. 29.  Attached to the Motion to Compel as Exhibit A were the requests for admission

(hereinafter, the "Requests for Admission"), as well as the requests for the production of

documents and interrogatories.  ECF No. 29-1, at 1-19 (Requests for Admission); *id.* at 20-25

(interrogatories and requests for production of documents).  The Court heard the Motion to Compel

on February 3, 2022; counsel for Ms. Espy, counsel for Mr. Stevens, and Mr. Stevens appeared at

the hearing.  ECF No. 37.  The Court orally ruled that the matters set forth in Ms. Espy's Requests

for Admission were deemed admitted; ordered Mr. Stevens to respond to Ms. Espy's

interrogatories and requests for the production of documents by February 7, 2022; and extended

Ms. Espy's time to file her lists of witnesses and exhibits to February 8, 2022.  *Id*.  The Court's

ruling was memorialized by order entered February 24, 2022.[6]  ECF No. 41.

---

[6] In the Requests for Admission, counsel for Ms. Espy provided a fifteen-day response period, citing an unspecified Local Bankruptcy Rule.  ECF No. 29-1, at 1.  Pursuant to Federal Rule of Bankruptcy Procedure 7036, which fully incorporates Federal Rule of Civil Procedure 36, a party has thirty (30) days to respond to requests for admission, unless otherwise stipulated by the parties or ordered by the Court.  Fed. R. Civ. P. 36(a)(3).  Neither party here filed or presented any evidence of a stipulated deadline, and the Court did not order a deadline contrary to the rule.

The Court finds that this minor procedural defect is not fatal to, nor does it cause the Court to reconsider, the outcome of the Motion to Compel.  Mr. Stevens had substantial time beyond the fifteen (15) days that Ms. Espy's counsel provided to respond to the Requests for Admission prior to the filing of the Motion to Compel and the Court's subsequent determination that the matters were deemed admitted.  There is no question that Mr. Stevens and his counsel had adequate notice of the Requests for Admission, as evidenced by counsel's statements at the February 3, 2022 hearing on the Motion to Compel that the requests were propounded on December 8, 2021.  ECF No. 29-1.  Additionally, Mr. Stevens did not respond to the interrogatories or requests for production (issued contemporaneously with the Requests for Admission) prior to or after the filing of the Motion to Compel and the hearing thereon.  Further, Mr. Stevens neither objected to any of the discovery response deadlines nor requested additional time within which to respond, and was wholly unresponsive to Ms. Espy's discovery requests.  Therefore, the Court finds that Mr. Stevens effectively waived any argument as to an improper discovery response period.

### E. Trial Proceedings

On February 1, 2022, prior to the hearing on the Motion to Compel, counsel for Ms. Espy filed lists of witnesses and exhibits, as provided for by the Amended Pretrial Order. ECF Nos. 33-34. Counsel for Mr. Stevens filed separate witness and exhibit lists on February 7, 2022. ECF Nos. 35-36. The Court conducted the Trial as scheduled on February 16, 2022. ECF No. 40. At the commencement of the Trial, the Court reminded the parties of the earlier ruling deeming the Requests for Admission as admitted. ECF No. 43, Feb. 16, 2022 Trial Transcript (hereinafter, "Transcript"), at 3. Further, finding that no objections had been filed to the exhibits, the Court deemed all exhibits to be admitted. *Id*. at 3. Counsel for Ms. Espy made an oral motion for summary judgment based on the content of the matters covered by the Requests for Admission. *Id*. at 4. After considering the arguments of both parties, as well as statements made by Mr. Stevens himself, the Court denied the motion for summary judgment without prejudice. *See id*. at 4-11.

## II. FINDINGS OF FACT

### A. Requests for Admission

As recounted *supra*, Mr. Stevens failed to respond to Ms. Espy's properly propounded Requests for Admission. Accordingly, pursuant to this Court's order entered February 24, 2022, the following matters are admitted by Mr. Stevens and further are binding and conclusively established in this proceeding.[7] Fed. R. Bankr. P. 7036 (incorporating by reference Federal Rule of Civil Procedure 36(b)).

1. Mr. Stevens "contracted with [Ms.] Espy to raise or install a floor in her garage to the level of flooring in the home."

2. Mr. Stevens "contracted with [Ms.] Espy to install flooring in her garage."

---

[7] The numbering of the various Requests for Admission is retained herein.

3.  Mr. Stevens "contracted with [Ms.] Espy to provide lighting and electrical in her garage."

4.  Mr. Stevens "represented to [Ms.] Espy that [he was] a licensed contractor."

5.  "[I]n June and July 2020, [Mr. Stevens] advertised [him]self to the public as a licensed contractor."

6.  Mr. Stevens "contracted with [Ms.] Espy to remove the garage door and replace it with a wall or large window."

7.  Mr. Stevens "contracted with [Ms.] Espy to install siding on the new suite as it would not be climate controlled."

8.  Mr. Stevens "quoted [Ms.] Espy a price of $12,000.00 to perform the services in her home."

9.  Mr. Stevens "provided [Ms.] Espy with a copy of [his] business card, which indicate[d] [he was] 'an independent contractor, trading as Stevens Remodeling,' and that [he was] 'insured & licensed.'"

10.  Mr. Stevens "held a contractor's license issued by the Virginia Department of Professional Occupancy regulation prior to January 1, 2020."[8]

11.  "[A]t the time [Mr. Stevens] contracted with [Ms.] Espy and during the time that work was performed, [he] never held a contractor's license issued by the Commonwealth of Virginia."

12.  "[Ms.] Espy paid [Mr. Stevens] $7,640.00 on June 29, 2020, and [he] provided receipt number 539990 confirming receipt indicating it was for 'garage remodel/flooring.'"

13.  "[Ms.] Espy paid [Mr. Stevens] $625.00 on July 10, 2020, and [he] provided receipt number 539992 indicating it was for 'bathroom/bedroom.'"

---

[8] Based upon the representations and arguments made by Ms. Espy and her counsel throughout the proceedings, the Court believes that the correct Virginia executive branch agency being referred to in Request for Admission number 10 is the Virginia Department of Professional and Occupational Regulation.

14.  "[T]he construction services [Mr. Stevens] provided to [Ms.] Espy required the City of Hampton to issue a permit in order to meet the city's Codes and Compliance requirements."

15.  Mr. Stevens "provided no construction permit with regard to the services [he] performed at [Ms.] Espy's home."

16.  Mr. Stevens "provided [Ms.] Espy with no written contract to evidence her agreement with [him]."

17.  "[T]he document attached [to the Requests for Admission] as Exhibit A is a receipt [Mr. Stevens] provided [Ms.] Espy evidencing her payment of $7,640.00 to [him] on June 29, 2020."

18.  "[T]he document attached [to the Requests for Admission] as Exhibit B is a receipt [Mr. Stevens] gave [Ms. Espy] evidencing her payment of $625.00 to [him] on July 10, 2020."

19.  "[T]he document attached [to the Requests for Admission] as Exhibit C is the business card [Mr. Stevens] provided [Ms.] Espy at or prior to contracting with her to provide services to her home in 2020."

20.  "[T]he documents attached [to the Requests for Admission] collectively as Exhibit D are receipt[s] of materials provided by [Ms.] Espy which [Mr. Stevens] incorporated in the construction, or otherwise removed from [Ms. Espy's] property and did not return to her."[9]

---

[9] Federal Rule of Civil Procedure 36(a)(2) requires that each request to admit "be separately stated." Fed. R. Civ. P. 36(a)(2). At least one court within the Fourth Circuit has concluded that the failure to state separately the documents subject to a request for admission fails to satisfy Rule 36(a)(2). *See Mach. Sols., Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 535 (D.S.C. 2018) (quoting *Swofford v. Eslinger*, No. 6:08-cv-66-Orl-35DAB, 2009 WL 961115, at *3 (M.D. Fla. Apr. 7, 2009)) (denying plaintiff's motion to compel where documents were not separately stated in a request for admission). Here, in addition to failing to respond to the requests, Mr. Stevens likewise failed to object to the form of any of the requests. Accordingly, the Court finds that Mr. Stevens has waived any such objection.

21.  "[T]he document attached [to the Requests for Admission] as Exhibit E is a fair and accurate depiction of [Mr. Stevens's] website as it was published in June 2020, at the time [he] contracted with [Ms.] Espy."

22.  "[T]he document attached [to the Requests for Admission] as Exhibit F is a true and correct copy of the Bill of Particulars [Mr. Stevens] filed in the state court litigation with [Ms.] Espy."

23.  "[T]he document attached [to the Requests for Admission] as Exhibit G is a true and correct copy of a record maintained by the City of Hampton, Virginia's Department of Codes Compliance."

24.  "[T]he document attached [to the Requests for Admission] as Exhibit H is a copy of the contract [Mr. Stevens] or an entity [he] represented made with Eddie Chengiah in 2021."

25.  "[T]he document attached [to the Requests for Admission] as Exhibit I is a copy with four receipts of payments which [Mr. Stevens] signed evidencing $7,725.00 paid by Eddie Chengiah upon the contract attached [to the Requests for Admission] as Exhibit H."

26.  "[T]he document attached [to the Requests for Admission] as Exhibit J is a true and accurate copy of the Facebook page [Mr. Stevens] maintain[s] in operating a contracting business referred to as 'Quality Contracting L.L.C.' and as 'Quality Contracting Inc[.] L.L.C.'"

Each admission made here is proper under Federal Rule of Civil Procedure 36 as either an admission of fact; an application of the law to a fact; an opinion regarding either the law or a fact; or the genuineness of a described and exhibited document.  Fed. R. Civ. P. 36(a)(1).  "[O]nce a matter that is properly subject of an admission under Rule 36(b) has been admitted during discovery, the district court is not free to disregard that admission." *Adventis, Inc. v. Consol. Prop. Holdings, Inc.*, 124 F. App'x 169, 173 (4th Cir. 2005) (citing *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3d Cir. 1992)).  The conclusive, binding effect of the admissions precludes

consideration of any evidence or testimony presented by Mr. Stevens that contradicts the admissions. *See Carney v. IRS* (*In re Carney*), 258 F.3d 415, 421 n.9 (5th Cir. 2001) ("So long as the default admissions remain in the record, no amount of additional discovery could overcome their effect."); *Buckner v. Tygart Valley Constr., Inc.*, Civil Action No. 2:04 CV 75, 2007 WL 2416373, at *11 (N.D. W. Va. Aug. 20, 2007) (deeming plaintiff's unanswered requests for admission as admitted and concluding that "[t]he practical effect" of so doing was "to render the deposition testimonies of [two of defendant's witnesses] submitted stricken to the extent said deposition testimonies [were] inconsistent with [the defendant]'s admissions"). As the United States Court of Appeals for the Fifth Circuit succinctly explained:

> An admission that is not withdrawn or amended cannot be rebutted by contrary testimony or ignored by the district court simply because it finds the evidence presented by the party against whom the admission operates more credible. This conclusive effect applies equally to those admissions made affirmatively and those established by default, even if the matters admitted relate to material facts that defeat a party's claim.

*Am. Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke, P.C.*, 930 F.2d 1117, 1120 (5th Cir. 1991) (footnotes omitted).

Like other courts facing similar instances, the Court recognizes this result is highly punitive. However, the impact to the party who seeks but is unable to obtain discovery from a dilatory litigant is manifest and significant. The Court must "insure the orderly disposition of cases for which parties to a lawsuit must comply with the rules of procedure." *Hill v. Laury*, Civil Action No. 3:06CV79, 2006 WL 2631796, at *3 (E.D. Va. Sept. 13, 2006) (citing *O'Bryant v. Allstate Ins. Co.*, 107 F.R.D. 45, 48 (D. Conn. 1985)). Mr. Stevens could have sought relief from this result by requesting either an extension of time to respond or withdrawal (or amendment) of the admissions. Not only did Mr. Stevens fail to do so, but he failed to make any attempt whatsoever to respond to the Requests for Admission. *See In re Carney*, 258 F.3d at 419-20

11

(affirming summary judgment based on debtor's failure to respond to requests for admission where debtor also failed to seek relief from the deemed admissions). Accordingly, the result is appropriate here.

Both parties introduced documentary and testimonial evidence at trial. Except as noted herein, neither party objected to the evidence introduced by the other. To the extent that Mr. Stevens's evidence conflicts with those matters deemed admitted by him, Ms. Espy's failure to object to the introduction of such contrary evidence constitutes neither a waiver by Ms. Espy nor a constructive motion for withdrawal or amendment of the admissions by Mr. Stevens. *See Johnson v. Royal Coal Co.*, 326 F.3d 421, 426-27 (4th Cir. 2003) (citing *Am. Auto. Ass'n*, 930 F.2d at 1119-20). Further, to the extent Ms. Espy has introduced evidence that overlaps or supplements those matters admitted by Mr. Stevens, such actions do not equate to a waiver of her right to rely on those admissions. *See id.* at 427 (citing *Brook Vill. N. Assocs. v. Gen. Elec. Co.*, 686 F.2d 66, 71-72 (1st Cir. 1982)).

## B.  EVIDENCE AT TRIAL

### 1.  The Initial Contract

Mr. Stevens has worked in the home improvement trade for approximately twenty-three (23) years, primarily as an employee for other companies. Transcript, at 53, 66. He started his own home improvement business shortly before being hired by Ms. Espy. *Id*. at 53, 65-66. Ms. Espy contracted with Mr. Stevens, both in his individual capacity and with his business, Stevens Remodeling. *Id*. at 12-13. Mr. Stevens provided Ms. Espy with a business card, which indicated, like his website that she reviewed, that he was "licensed and insured." *Id*. at 12, 23-24; *see also* Plaintiff's Exhibit 5, Business Card; Plaintiff's Exhibit 6, Stevens Remodeling Facebook Page. Mr. Stevens also told Ms. Espy that he was licensed, insured, and capable of performing the work

she desired, although he never showed her a copy of any license.  Transcript, at 23-24.  Ms. Espy

relied upon these cumulative representations, believing they signified that Mr. Stevens was a

contractor licensed by the Commonwealth of Virginia.  *Id*. at 12-13; *see also* Requests for

Admission numbers 4, 5, 9, 19, and 21, *supra*.  Ms. Espy placed great importance on Mr. Stevens's

licensure and insurance status because she "wanted to make sure somebody knew what they were

doing.  And also, that my house will be for sale in about five years, so I wanted it to be done

correctly for the resale value."  Transcript, at 12.

Mr. Stevens's testimony as to his licensure status, while not specifically contradictory to

the deemed admission that he did not hold a contractor's license issued by the Commonwealth of

Virginia when working for Ms. Espy, is nonetheless obscure.  *See* Request for Admission number

11, *supra*.  Mr. Stevens qualified his reference to a "Virginia State license" by indicating that he

"went through the city" to obtain it.  Transcript, at 51.  Mr. Stevens denied knowing when he was

hired by Ms. Espy that the price for the work to be performed exceeded the threshold for which a

contractor's license issued by the Commonwealth of Virginia was required.  *Id*. at 65.  Rather, he

focused on customer satisfaction as he built the client base of his new business.  *Id*.  ("I was just

starting off.  I was just learning everything, figuring out all the ins and outs, and the ropes of

everything.  And my concern was mainly making sure customers were happy, and liked my

work.").  Mr. Stevens further denied any intent to deceive Ms. Espy, either with regard to his

qualifications or his ability to complete the desired work.  *Id*. at 63-64.

### 2.  The Invoice for and Deposit on the Initial Quote

Despite contracting with Mr. Stevens, Ms. Espy was never provided with a copy of a

written contract.  *Id*. at 13, 29.  Rather, Ms. Espy represented that Mr. Stevens wrote down the

work he was to perform, and the parties agreed on a price of $12,100.00. *Id*. at 13.[10]   On cross-examination, when referred to invoice numbers 369660 and 369659 (the latter of which is discussed in Section II.B.4, *infra*), Ms. Espy admitted that she signed each invoice but denied both the existence of a written contract between the parties and the presence of any dollar amounts on either invoice when she signed them. *Id*. at 25-26, 28; *see* Defendant's Exhibit 4, Invoices, at 1-2; *see also* Transcript, at 28-29 (testifying that she signed the invoice on the date exhibited thereon, June 29, 2020). According to Ms. Espy, the contract price never changed from $12,100.00. Transcript, at 76-77. Ms. Espy did not see either invoice again until the instant adversary proceeding when Mr. Stevens included them among his exhibits. *Id*. at 29-30; *see also id*. at 48.

Mr. Stevens insisted that the invoices Ms. Espy signed listed not only the project tasks but also the agreed-upon prices following the parties' review and discussion of those details. *Id*. at 50-51; Defendant's Exhibit 4, at 1-2; *see also* Transcript, at 68. The first invoice, dated June 29, 2020, and bearing the number 369660, indicates the following tasks to be completed and accompanying prices:

| | | | |
|---|---|---|---|
| Remove wall and sheetrock, take out garage door. | | | |
| Build floor up. | | | |
| Sheetrock walls and ceiling | | | |
| Lay down Laminate floor in garage & kitchen. | | | |
| Add wall, add double window. Install siding | | | |
| Total price | $12,640 | | |
| deposit is material and Half of Labor | $7,640 | } | new balance |
| Remainder due when job complete | $5,000 | } | $6,600 |
| add on cost for extra sheetrock, framing | | } | pay $2,600 |
| ceiling and also all new window trim. | $1,600 | } | 7/10 today |
| | | | $4,000 |
| | | | when done |

---

[10] Request for Admission number 8, *supra*, indicates a contract price of $12,000.00.

Defendant's Exhibit 4, at 1;[11] *see also* Requests for Admission numbers 1, 2, 6, and 7, *supra* (admitting to the services agreed upon with Ms. Espy).  The foot of the invoice displays a signature, which, albeit unreadable to the Court, the parties agree is that of Ms. Espy.  Defendant's Exhibit 4, at 1; *see also* Transcript, at 25-26, 69.  At the time the parties contracted, Ms. Espy paid Mr. Stevens a deposit of $7,640.00.  Transcript, at 13; *see* Plaintiff's Exhibit 1, Receipt dated June 29, 2020 (bearing receipt number 539990 and indicating a $7,640.00 check was received from Tina Espy by "Mike" for "garage remodel/flooring"); *see also* Transcript, at 16; Requests for Admission numbers 12 and 17, *supra*.  Mr. Stevens asserted that the items through the line indicating a balance of $5,000.00 (but excluding the column beginning "new balance") were present prior to Ms. Espy affixing her signature; the subsequent items were added in Ms. Espy's presence.  Transcript, at 69.  Ms. Espy disagreed, stating that when she signed invoice number 369660, it neither included the text in the lower right corner nor was this information added in her presence.  *Id*. at 30, 76; Defendant's Exhibit 4, at 1.

### 3.  Scope of Work Included in the Initial Quote

According to Mr. Stevens, his initial quote provided on June 29, 2020, included the purchase price for the flooring.  Transcript, at 73-74.  Ms. Espy repudiated his assertion, however.  While Ms. Espy believed that Mr. Stevens would supply all requisite materials for the projects set forth in the initial quote, he failed to do so.  *Id*. at 13-14.  Ms. Espy directly paid Mr. Stevens $1,300.00 for flooring, and she spent additional money to purchase drywall and sheetrock (which items she testified were not installed by Mr. Stevens).  *Id*. at 13-14, 77; *see* Plaintiff's Exhibit 2, Check dated July 6, 2020 (check number 2467 payable from Tina Espy to Michael Stevens in the

---

[11] The handwritten invoice contains the capitalization, punctuation, and formatting as reflected herein.

amount of $1,300.00); *see also* Transcript, at 79.  Ms. Espy's Exhibit 4 consists of seven (7) receipts: two (2) from Lowe's Home Centers, LLC, dated July 7, 2020, and July 12, 2020, respectively, and five (5) receipts from The Home Depot between July 12, 2020, and July 13, 2020. Plaintiff's Exhibit 4, Receipts for various materials.  Ms. Espy did not testify regarding these receipts, which, combined, total $815.48.  *See id*.  While it is difficult for the Court to discern the nature of some of the items based on the descriptions on the receipts, the items appear to include drywall, wall studs, subflooring, and bathroom fixtures.  *See id*.  Ms. Espy also purchased insulation based on her belief that its installation was part of the agreement since Mr. Stevens explained that insulation was required on exterior walls by the building code.  Transcript, at 77. Ms. Espy conceded, however, that insulation was not addressed on any of the invoices or receipts. *Id*.

Ms. Espy also testified regarding the extent of electrical and plumbing work as it related to the original agreement.  Ms. Espy professed her belief that the $12,100.00 contract price included the necessary electrical work, even though such work was not delineated on the invoices.  *Id*. at 14, 31-32; *see* Defendant's Exhibit 4, at 1-2; *see also* Transcript, at 27.  Ms. Espy "thought [electrical] was obvious" for a bedroom and relied on Mr. Stevens in this regard, even though she knew Mr. Stevens himself did not perform electrical work.  Transcript, at 28, 32.  Indeed, Mr. Stevens admitted that the contract included lighting and electrical work.  Request for Admission number 3, *supra*.  Instead, Ms. Espy ultimately paid $800.00 directly to an electrician.  Transcript, at 14-15, 27; Plaintiff's Exhibit 3, Receipt for payment to electrician (indicating an electronic payment of $800.00 to Thomas Bryant on July 10 in an unspecified year).  Ms. Espy had to contract directly with the electrician, according to Mr. Stevens, because the electrical work was beyond the project's initial scope.  Transcript, at 59-60.

In addition, Ms. Espy paid separately for a plumber because the plumbing was not included in the original $12,100.00 contract price, unlike her expectation regarding the materials and electrician. *Id*. at 14-15; *see also id*. at 27.  On redirect examination, Ms. Espy stated that because Mr. Stevens did not do plumbing work, she believed he would subcontract the plumbing work and pass the cost on to her in the final total for the services. *Id*. at 28, 31.  Mr. Stevens professed that Ms. Espy was aware of her responsibility to secure and pay a plumber due to the addition of a bathroom to the project subsequent to the agreement on the initial scope of work. *Id*. at 59; *see also id*. at 66-67.

### 4.  Additional Work Requested by Ms. Espy

Mr. Stevens maintains that he and Ms. Espy discussed additional work to be performed after the original project commenced. *Id*. at 51, 58; *see also id*. at 57.  The work included adding a bathroom and a wall to separate the bathroom from the remainder of the room Mr. Stevens was constructing in the former garage space. *Id*. at 58.  A second invoice, dated July 10, 2020, and bearing the number 369659, indicates the following tasks to be completed and accompanying prices:

| | |
|---|---|
| Build walls for bathroom | |
| Frame out door | |
| install bathroom door | |
| Install toilet | |
| Install vanity. | |
| Sheetrock walls | |
| Totall (*sic*) for Labor and materials | $2,250 |
| Half up front for deposit | $1,125 |
| Remainder due when finished | $1,125 |
| Add on for Hallway wall and taking out | |
| Floor for plumbers | $2,500 |
| Remaining balance after add on | $3,625 |

Defendant's Exhibit 4, at 2.[12]  The parties agree that the signature below the list of tasks is that of Ms. Espy.  Transcript, at 25-26, 50; Defendant's Exhibit 4, at 2.[13]  Mr. Stevens acknowledged that language was added to the invoices after Ms. Espy signed them but that this occurred in Ms. Espy's presence and with her consent.  Transcript, at 68-69; *see also id*. at 70.  Ms. Espy asserted, however, that the prices written on invoice number 369659 do not equal the prices she and Mr. Stevens discussed.  *Id*. at 30; *see* Defendant's Exhibit 4, at 2.

After discussing the details of the additional tasks, Ms. Espy gave Mr. Stevens a check for the deposit.  Transcript, at 58; *see also id.* at 69-71.  Ms. Espy challenged the deposit amount of $1,125.00 reflected by invoice number 369659, claiming that her deposit was in a different amount.  *Id*. at 30, 46; *see* Defendant's Exhibit 4, at 2.  Ms. Espy exhibited two receipts, both dated July 10, 2020; the first indicating a $625.00 payment, and the second reflecting a $3,100.00 payment.  Plaintiff's Exhibit 1, Receipt dated July 10, 2020 (bearing receipt number 539992 and indicating a $625.00 check was received from Tina Espy by "Mike" for "Bathroom/Bedroom"); *Id*., Second Receipt dated July 10, 2020 (bearing receipt number 539991 and indicating a $3,100.00 credit card payment was received from Tina Espy by "Mike" for "Bathroom/Bedroom"); *see also* Transcript, at 46, 48; Requests for Admission numbers 13 and 17, *supra*.  Ms. Espy expressed that the $3,100.00 payment represented payment in full for construction of the bathroom because she supplied materials and fixtures, including a toilet, sink,

---

[12] The handwritten invoice contains the capitalization and punctuation as reflected herein.

[13] A third page, which is undated, unsigned, and unlabeled, attached to Mr. Stevens's Exhibit 4 sets forth itemized prices for flooring, baseboards, sheetrock, doors, and step framing with a total of $1,762.00.  Defendant's Exhibit 4, at 3.  The document also lists an unpaid balance of $7,625.00, less unfinished work totaling $1,762.00, and indicating a new balance for work completed of $5,863.00.  *Id*.  Mr. Stevens did not explain this page of Exhibit 4 during his testimony.  Ms. Espy was wholly unfamiliar with the aforementioned third page attached to Mr. Stevens's Exhibit 4. Transcript, at 32; Defendant's Exhibit 4, at 3.

and door, and the plumbing was not included in the work Mr. Stevens was to perform.  Transcript,

at 47-48.  She declared that Mr. Stevens only "had to . . . build a small wall to enclose [the

bathroom]."  *Id*. at 47.  When questioned by counsel for Mr. Stevens, Ms. Espy denied that she

realized she was over budget before asking for additional work to be done, instead claiming that

she asked for a bathroom to be added when she was still on budget and before the parties came to

an impasse.  *Id*. at 27; *see also id*. at 33.

5.  Ms. Espy's Dissatisfaction with Mr. Stevens's Work and
the Breakdown of the Working Relationship

Ms. Espy testified regarding the extent and quality of Mr. Stevens' work.  Although she

had no specific prior knowledge regarding building code requirements, she was dissatisfied with

several aspects of the work performed.  *Id*. at 17.  Regarding the flooring work to be completed,

Ms. Espy testified that Mr. Stevens installed the subfloor but not the flooring product itself.  *Id*. at

21.  Ms. Espy alleged that the floors squeaked when walked on, and Mr. Stevens did not rectify

this issue despite saying he would do so.  *Id*. at 17.  According to Ms. Espy, the floor joists were

improperly installed, as they were secured only by nails and did not rest on any kind of support.

*Id*. at 20.  By contrast, Mr. Stevens claims familiarity with construction standards.  *Id*. at 53.  To

this end, he insisted that the floor joists he constructed were installed correctly.  *Id*. at 53-54.

Additionally, Ms. Espy was displeased with the window Mr. Stevens installed in the

exterior wall because it "leak[ed]" and was neither level nor "flush with the house."  *Id*. at 17, 22.

Ms. Espy discussed the window with Mr. Stevens on an ongoing basis during his work.  *Id*. at 22.

Ms. Espy had relayed to Mr. Stevens that she wanted a large window installed so as to minimize

the amount of siding visible on her brick home; however, Mr. Stevens installed "the smallest

window he could purchase, that opens the opposite direction of all the other windows in my house."

*Id*. at 23.  Ms. Espy was further unhappy that the window was installed at a low height.  *Id*. Mr.

19

Stevens defended the window location in the replacement wall by asserting that it was placed as high as possible, in consideration of the low ceiling height and that the floor level of the former garage was raised to be consistent with the rest of the home. *Id*. at 54-55. Mr. Stevens did not address Ms. Espy's contention that the window was smaller than she desired.

Mr. Stevens installed materials in the former location of the garage door, as Ms. Espy requested, but Ms. Espy indicated that he "installed [the replacement materials] directly on top of the cement" instead of cutting into the cement or foundation. *Id*. at 20. Ms. Espy noted that the exterior wall of the garage would need to be removed since it was neither properly installed nor sealed. *Id*. at 20, 22. Mr. Stevens contended, however, that the wall constructed to replace the garage door was properly anchored, using the same process his prior employers used. *Id*. at 54. Mr. Stevens represented that the replacement wall aligned with the footprint of the removed garage door, the latter of which was not flush with the remainder of the home. *Id*. Ms. Espy asserted that Mr. Stevens also failed to insulate the garage construction as requested, even though Ms. Espy had purchased the insulation. *Id*. at 20.

The parties' have somewhat divergent views as to the reason the working relationship ceased. Ms. Espy stated that eventually, she calculated that she had paid Mr. Stevens approximately $14,000.00, well over the agreed upon $12,100.00.[14] *Id*. at 15-16; *see also id*. at 17. Upon this realization, Ms. Espy questioned Mr. Stevens about the increased cost, at which point he indicated to Ms. Espy that the job would cost "an additional . . . 5 or 6,000 [dollars] at the end[.]" *Id*. at 16. Ms. Espy relayed to Mr. Stevens that the cost of the job exceeded the value of

---

[14] Based on the evidence in the record, the Court finds that Ms. Espy directly paid Mr. Stevens the total amount of $12,665.00, consisting of: (1) the initial deposit of $7,640.00; (2) a $1,300.00 payment for flooring materials; (3) the $3,100.00 deposit for the additional bathroom work; and (4) $625.00 paid for the additional bedroom and bathroom work. The Court's explicit finding findings regarding damages are more thoroughly explained *infra*.

the work performed.  *Id*.; *see also id*. at 33.   However, Ms. Espy likewise denied that the relationship between the parties broke down when she told Mr. Stevens she was out of money and could not pay him; rather, she represented that the relationship started to deteriorate when she questioned the quality of his work and his expenditure of funds on the project.  *Id*. at 26, 33.  The relationship was further damaged, according to Ms. Espy, when she discovered that Mr. Stevens had not acquired the requisite building permits, at which point she ceased all work on the project. *Id*. at 33; *see also* Requests for Admission numbers 14 and 15, *supra* (admitting that, while required, Mr. Stevens obtained no permits for the work performed on Ms. Espy's home).

According to Mr. Stevens, the working relationship broke down shortly after he agreed to construct the bathroom for Ms. Espy.  Ms. Espy told him that she had expended her budget for the project and requested a price reduction.  Transcript, at 58.  Mr. Stevens pledged to review the agreed-upon amount for the work, but later Ms. Espy communicated to him via text message that even with a price reduction, she had no additional funds to pay him.  *Id*. at 59.  Mr. Stevens, however, insisted on being paid for the work he had completed.  *Id*.  Mr. Stevens only ceased his work upon Ms. Espy's direction to do so based on her lack of funds.  *Id*. at 64.

### 6.  Text Message Exchange

Mr. Stevens's Exhibit 2 consists of a series of text messages between the parties dated July 14 and July 15.[15]  Defendant's Exhibit 2, Text Messages from Tina Espy Canceling Job.  Ms. Espy confirmed that she engaged in text message exchanges with Mr. Stevens during the project. Transcript, at 26; *see also id*. at 27, 47.  Accordingly, while no year is displayed with the month and day, the Court presumes these messages were exchanged in 2020.

---

[15] The date of the messages on the first page of Defendant's Exhibit 2 is not visible.  Defendant's Exhibit 2, at 1.  The messages exchanged on the unknown date concern work Mr. Stevens would be completing the following day at Ms. Espy's residence.  *Id*.

The content of the text message exchange largely confirms each party's testimony. The text messages begin at 1:01 p.m. on July 14, with Mr. Stevens indicating that he could reduce the amount Ms. Espy owed to $5,625.00, which amount was $2,000.00 less than originally agreed, with the mutual understanding that Ms. Espy would install the baseboard, trim, and kitchen floor herself. *See* Defendant's Exhibit 2, at 2-4; *see also id.* at 5-6. Ms. Espy asserted that the total due exceeded the estimates and her budget, particularly in light of work she claimed was unfinished and the materials she purchased for the project. *Id.* at 2-3, 5-6. She admitted, however, that she had failed to correctly add all of the project's costs together until after certain checks cleared her bank account. *Id.* at 4.

Ms. Espy disputed Mr. Stevens's representations of the contents of the invoices she signed, although she did not receive a copy of them. *Id.* at 5-6. She alleged that Mr. Stevens added unapproved language to the invoices after she signed the documents. *Id.* at 6, 9. Ms. Espy fired Mr. Stevens, asserting he failed to complete the agreed-upon work despite receiving payment; Mr. Stevens, however, indicated his desire to complete the work and be paid for it. *Id.* at 6-7. Ms. Espy expressed several times in the text message exchange that she was terminating the work due to a lack of funds in her budget. *Id.* at 4, 6, 8, 11, 18.

Ms. Espy was displeased that the speed of the work, tidiness of her yard, and the incomplete work on certain walls and floors. *Id.* at 8, 15-16. Mr. Stevens pointed out sequencing issues with Ms. Espy's separately contracted on-site tradespeople, noting that the flooring could not be installed until the plumber finished his work and sheetrock was installed; further, walls could not be completed until the electrician had concluded his tasks. *Id.* at 10. Mr. Stevens also cited Ms. Espy's expanded scope of work as the cause for the lengthier project completion time. *Id.* at 10-

11. Mr. Stevens indicated his intent to remove all debris from the job site once the project was completed. *Id*. at 15.

The parties also discussed the issue of a city permit for the work. Ms. Espy represented at one point that "the city" (presumably referring to a code compliance officer for the city of Hampton, Virginia) was at her home; she claimed unfamiliarity with the need for a city permit and was concerned that she would be fined. *Id*. at 7, 9, 14. Ms. Espy indicated all work on the project had to cease per city regulations because she did not have a permit. *Id*. at 9, 13. Mr. Stevens referenced prior statements made by Ms. Espy that, based upon her research, she did not need a permit for the work to be completed, which discussions Ms. Espy denied. *Id*. at 12-13. Mr. Stevens admitted, though, that he should have confirmed whether a permit was required. *Id*. at 12. Mr. Stevens requested a copy of any notice Ms. Espy received from the city. *Id*. at 20.

While Ms. Espy acknowledged that changes had occurred since the invoices were signed, she provided no specifics in the text messages. *Id*. at 8-9. Ms. Espy refused to pay for any unfinished work. *Id*. at 9. Mr. Stevens agreed that the work was incomplete due to Ms. Espy terminating him; however, he also expressed a desire to complete the job had he not been fired. *Id*. at 11; *see also id*. at 7, 15. Mr. Stevens indicated he would pursue Ms. Espy through litigation for the balance due on the project. *Id*. at 8, 11-12, 14. Ms. Espy indicated she would pursue Mr. Stevens for the cost of insulation (accusing him of "trashing" or otherwise removing it from the garage), a cabinet (which was left outside in the rain), and her time spent cleaning up construction debris in her yard. *Id*. at 14, 17-18; *see also id*. at 19-20. Mr. Stevens confirmed that he disposed of one piece of insulation but denied taking any insulation from Ms. Espy's home, retorting that there was very little insulation on the ceiling area of the garage and none in the walls. *Id*. at 15,

19; *see also* Transcript, at 73.  He believed Ms. Espy was going to use the referenced cabinet in a

shed.  Defendant's Exhibit 2, at 15.

7.  Aftermath of the Termination of Services

The parties agree that Ms. Espy made no additional payments after she terminated Mr.

Stevens.  Ms. Espy claims that when Mr. Stevens ceased work and left her property, he took

materials, including thirteen boxes of flooring, sheetrock, plywood, window trim, and baseboards.

Transcript, at 21-22, 33.  She also asserts Mr. Stevens took a portion of the insulation she

purchased, and "the rest was just thrown up in the attic, not even where it's supposed to be."  *Id*.

at 20.

Mr. Stevens countered that he retrieved his tools and work supplies from Ms. Espy's home

but denies taking any building materials purchased by Ms. Espy.  *Id*. at 71-72.  Rather, the only

building materials he took were those he purchased but that were neither installed nor paid for by

Ms. Espy.  *Id*.  Apparently included among those materials were ones that Mr. Stevens returned to

Lowe's in Hampton, Virginia, on July 15, 2020.  Defendant's Exhibit 3, Lowe's Purchase and

Return Receipts.  Mr. Stevens's Exhibit 3 consists of two purchase receipts dated July 6, 2020

(totaling $825.69), and July 13, 2020 (totaling $321.33), and one return receipt dated July 15,

2020.  *Id*.  The return receipt contained all materials purchased on July 6, 2020, and a majority of

the materials purchased on July 13, 2020, for a total refund amount of $1,051.31.  *Id*. at 2.  Mr.

Stevens filed a lawsuit in state court for the balance due on the completed work, to which Ms. Espy

filed a countersuit.  Transcript, at 60-61, 74-75.[16]  Ms. Espy was awarded default judgment on her

---

[16] Among Mr. Stevens's exhibits is a copy of the state court case file.  Defendant's Exhibit 1, State
Court Case File.  The documents contained in the exhibit include the warrant in debt Mr. Stevens
filed against Ms. Espy on July 29, 2020; the bill of particulars Mr. Stevens filed on October 26,
2020; various communications between Ms. Espy's counsel and the state court with dates ranging
from August 2020 through October 2020; various subpoenas issued by Ms. Espy's counsel in the

countersuit due to Mr. Stevens's failure to appear at trial, the date for which Mr. Stevens declared he was unaware.  *Id*. at 61-62.  Ms. Espy was unable to obtain any relief from the Virginia Department of Professional and Occupational Regulation[17] or from the "Contractor Fraud Fund"[18] because Mr. Stevens was not a licensed Virginia contractor.  *Id*. at 23.

Ms. Espy had all of the items installed by Mr. Stevens removed from her home with the exception of the exterior work.  *Id*. at 19.  Ms. Espy still intended to replace the exterior items because they were "not done correctly, and nobody will fix it using somebody else's incorrect work."  *Id*.  The subflooring was among the items removed, which work Ms. Espy and her son completed.  *Id*. at 22.

Ms. Espy included among her exhibits a report Mr. Stevens admitted is from the City of Hampton, Virginia's office of codes compliance, dated September 17, 2020, although she provided no testimony regarding this exhibit.  Plaintiff's Exhibit 8, Report from City of Hampton, Virginia Codes Compliance; *see* Request for Admission number 23, *supra* (referencing Exhibit G attached thereto, which is identical to Plaintiff's Exhibit 8).  The document displays Ms. Espy's home address, indicates a "Requested Date" of September 11, 2020, and recites, "Resident was in the process of having a garage conversion done.  Contractor never got any permits and was subsequently fired.  She would like an Inspector to come look at the work and advise before it is

---

state court litigation and proof of service thereof; Ms. Espy's grounds of defense, request for damages, and exhibits thereto filed October 29, 2020; a letter dated November 2, 2020, from the Assistant City Attorney for the City of Hampton, Virginia to a subpoena duces tecum directed to the Hampton Department of Community Development for records regarding Ms. Espy's property and an attachment thereto; and a letter from Mr. Stevens to the state court requesting a trial date continuance.  *See id.*  The exhibits to Ms. Espy's grounds of defense and request for damages are all exhibited among her exhibits filed in the instant matter.  *See generally* Plaintiff's Exhibits 1-5.

[17] Counsel for Ms. Espy mistakenly referred to this agency as the "Virginia Division of Professional Occupancy Regulation" during the trial.  *See* Transcript, at 23.

[18] The official name of the referenced fund is the Virginia Contractor Transaction Recovery Fund.

all torn down." Plaintiff's Exhibit 8, at 1. The document further indicates, "Owner stopped work due to no permits for a garage conversion. Will seek a qualified contractor to do the conversion." *Id*. The document indicates a status of "Investigated – Complete" but is otherwise devoid of any evaluation or comments by the investigating code compliance officer. *Id*.

### 8. Mr. Thomas's Testimony

Ms. Espy offered the testimony of Kenny Thomas. Transcript, at 34. Mr. Thomas performs design and estimation work for a company named Total Home Improvement, where he has been employed for six years. *Id*. at 35. Mr. Thomas completes between 100 and 120 residential home estimates annually. *Id*. Mr. Thomas declared that familiarity with local building codes, including the building codes for the City of Hampton, Virginia, where Ms. Espy's home is located, was required for his employment. *Id*. at 35-36. Counsel for Ms. Espy asked the Court to qualify Mr. Thomas as an expert witness in the field of estimation and construction requirements for residential homes. *Id*. at 36. With no objection from counsel for Mr. Stevens, the Court accepted Mr. Thomas as an expert witness as requested. *Id*.

Mr. Thomas examined the work that Mr. Stevens performed at Ms. Espy's home "a year and a half or two years ago." *Id*. at 36-37, 41. Mr. Thomas unequivocally stated that Mr. Stevens's work did not meet the building code requirements for the City of Hampton, Virginia. *Id*. at 37. Mr. Thomas listed several problems with Mr. Stevens's work, stating that the floor joists were improperly secured to the studs of the exterior wall with nails. *Id*. Mr. Thomas opined that "in no way, shape, form, or fashion should that be how the joists are supported." *Id*. Mr. Thomas indicated that the proper method for installing floor joists required some form of support below the joists rather than the joists being secured solely to the studs. *Id*. at 41-42. He noted that it would be significantly less expensive to remove the joists rather than repair them as constructed.

*Id*. at 37.  However, Mr. Thomas provided no dollar amount or price differential for repair versus replacement of the joists.

Mr. Thomas asserted that the wall constructed and installed in place of the garage door did not satisfy the applicable building code requirements.  *Id*.  Mr. Thomas explained, "An exterior wall is supposed to bear on the continuous footing.  The concrete had not been cut, nor had any excavation been done to pour an additional piece of footing under that wall, and marry it to the other two sides, so that [there was] a continuous footing." *Id*. at 38.  Due to these defects, Mr. Thomas testified that the wall Mr. Stevens constructed could not be repaired *in situ* and had to be removed.  *Id*.  Mr. Thomas described the manner in which Mr. Stevens installed the window as "[v]ery odd." *Id*. at 39.  He explained that the floor adjacent to the window had been elevated, and the top of the window was "approximately waist high[,]" "very, very low in proportion to the room."  *Id*.  Mr. Thomas confirmed that the window was "very small" and "peculiar as constructed." *Id*. at 40.  Mr. Thomas further represented that permits should have been obtained for the construction, plumbing, and electrical work; had permits been obtained, the issues with Ms. Espy's home would have been discovered according to Mr. Thomas.  *Id*.  When asked whether his assessment was that all the work Mr. Stevens performed at the property needed to be replaced, Mr. Thomas answered affirmatively.  *Id*. at 38.

While Mr. Thomas indicated there would be an expense to remove all the work Mr. Stevens performed, Mr. Thomas did not estimate what the expense would be, although he stated he had prepared an estimate of some type for Ms. Espy.  *Id*.  He additionally testified that none of the materials could be reused, and the homeowner would incur a disposal fee if they chose not to keep the removed items.  *Id*. at 39.

9.  Ms. Espy's Irrelevant Evidence

Ms. Espy included five (5) additional exhibits about which she provided no testimony. Exhibit 7 is the Bill of Particulars Mr. Stevens filed in the state court litigation when he sued Ms. Espy.  Exhibit 9 is a printout from the online records of the General District Court for the City of Virginia Beach, Virginia, for a civil case in May 2012 filed by the Commonwealth of Virginia regarding an administrative license suspension.  Exhibit 10 is an invoice for work by an entity named Quality Contracting for an individual named Eddie Chengiah.  Exhibit 11 purports to be a printout of a Facebook page for an entity named Quality Contracting L.L.C., which Ms. Espy asserts, by way of her exhibit list, is Mr. Stevens's current business entity.  Finally, Exhibit 12 is an invoice for work by an individual named Mike Beizer for an individual named Eddie Chengiah. Upon examination of the five (5) enumerated exhibits, the Court finds no relevance or correlation between the exhibits and the instant matter.  Accordingly, the Court will not consider them in the adjudication of Ms. Espy's Complaint.

Ms. Espy, by counsel, also attempted to offer the testimony of Mr. Eddie Chengiah, who was apparently also one of Mr. Stevens's home improvement business customers.  Transcript, at 42.  Counsel for Ms. Espy indicated that Mr. Chengiah's testimony would provide evidence of Mr. Stevens's business model such that the damages incurred by Ms. Espy were inflicted either recklessly or intentionally by Mr. Stevens.  *Id*.  Counsel for Mr. Stevens objected on the basis of relevance.  *Id*.  In response, counsel for Ms. Espy argued that Mr. Stevens entered into a contract with Mr. Chengiah subsequent to the contract he entered into with Ms. Espy.  *Id*. at 43.  In doing so, Ms. Espy's counsel argued that Mr. Stevens entered into the contract with Mr. Chengiah with the knowledge that he needed a specific type of licensure status, similar to the manner in which he contracted with Ms. Espy.  *Id*. at 43-44.  Upon consideration of the objection and response, the

Court sustained the objection, finding that the proposed testimony bore no relevance to the issues

before the Court.  *Id*. at 44.

C.  Legal Argument

1.  Basis for Nondischargeability

In support of the argument that the judgment she holds against Mr. Stevens should be

deemed nondischargeable in this bankruptcy case, Ms. Espy's counsel asserted that the evidence

showed that Mr. Stevens "intentionally and fraudulently induced Ms. Espy into this contract,

predicated on his status as a Virginia licensed contractor."  *Id*. at 81.  Ms. Espy alleges she "relied

reasonably" on the false representations Mr. Stevens made on both his website and his business

card that he held a valid Virginia contractor's license, which was a crucial factor in her decision

to contract with Mr. Stevens.  *Id*. at 81-82.  Ms. Espy contends that Mr. Stevens knew or should

have known that he needed a contractor's license, based upon his admission that he held such

license previously and his experience in the contracting field, albeit for other employers, for

twenty-three (23) years.  *Id*.  Mr. Stevens's lack of licensure precluded him both from legally

performing the work and obtaining a permit for it.  *Id*.  Additionally, counsel for Ms. Espy alleged

that Mr. Stevens exceeded the price limit for unlicensed contractor work,[19] which he also knew or

should have known.  *Id*. at 83.  Counsel for Ms. Espy also alleged that Mr. Stevens violated the

Virginia Consumer Protection Act.[20]  *Id*. at 81.

Ms. Espy's counsel highlighted the lack of a clear written contract, Mr. Stevens's retention

of the only copies of the invoices, and his admitted subsequent alteration of the invoices Ms. Espy

---

[19] The Court notes that Ms. Espy provided no evidence or support for this conclusory statement.

[20] The noted Virginia law, while mentioned in the Complaint, was not plead as a separate cause of action therein.  Further, counsel did not elaborate, either in his argument or in the Complaint, as to why that law provides a separate basis for nondischargeability in this case.

signed (modifications with which she claimed unfamiliarity) as reinforcing evidence of the fraud arguments. *Id*. at 84-85; *see also id*. at 87. Counsel for Ms. Espy speculated that Mr. Stevens changed or removed the original quoted amounts on the invoices, since the amount he contended he was owed, $7,625.00 (*see* Defendant's Exhibit 4, at 3), equaled "essentially what was paid." *See id*. at 85-87. Counsel further asserted that Virginia law requires a contractor to provide the client with a written copy of the executed contract for work such as that desired by Ms. Espy, although he provided no support or evidence for contention. *Id*. at 85, 86.

Counsel for Mr. Stevens declared that much of Ms. Espy's argument was speculative and unsupported by the evidentiary record. *Id*. at 88. Specifically, he argued that Ms. Espy presented no evidence supporting that the dollar amounts on the invoices were either not present or changed after she signed the invoices, particularly in light of the parties' conflicting testimony. *Id*. Mr. Stevens also argued that he could not have altered the contract after Ms. Espy signed it, as the contract was written on carbon paper, which copied the writing onto the pages behind the signatory page. *Id*.

Counsel for Mr. Stevens alleged that the Plaintiff failed to satisfy the requirements to show fraud. *Id*. at 89. Mr. Stevens first argued that a factual question existed as to whether he had the required contractor's license, despite his admission to the contrary.[21] *Id*. Counsel for Mr. Stevens urged the Court to weigh favorably Mr. Stevens's testimony regarding his licensure, maintaining that Ms. Espy had the burden to prove all elements of her charge but had failed to demonstrate that Mr. Stevens "is or is not licensed." *Id*. In the alternative, counsel asserted that even if Mr. Stevens was not licensed, Ms. Espy failed to prove that he knew he was unlicensed when he made the

---

[21] This argument is contrary to and does not overcome the deemed admission that Mr. Stevens did not hold a contractor's license at the time he contracted with Ms. Espy. Request for Admission number 11, *supra*.

representation to her at the time of contracting. *Id*. at 90. Mr. Stevens argued Ms. Espy also failed

to sustain her burden to prove Mr. Stevens made any misrepresentation regarding his license with

the intent to deceive her as well as her reliance on the misrepresented licensure status when

entering into the contract. *Id*. For these reasons, counsel for Mr. Stevens contended that Ms. Espy

failed to demonstrate that her damages were caused by Mr. Stevens's lack of a proper license. *Id*.

The Court questioned counsel for Mr. Stevens as to Mr. Thomas's testimony that all of Mr.

Stevens's work would need to be removed due to his lack of licensure. *Id*. Counsel responded

that Mr. Thomas and Mr. Stevens offered contradictory testimony as to the proper attachment

method for the floor joists and correct construction means for the garage wall, seemingly

requesting that the Court weigh the contravening statements. *Id*. at 90-91. Mr. Stevens's counsel

also addressed the conflicting testimony by Mr. Stevens and Mr. Thomas regarding the size and

location of the window but argued that the proper installation of the various items related not to

whether Mr. Stevens was licensed but, rather, to customer satisfaction. *Id*. at 91.

In rebuttal, counsel for Ms. Espy rejected the notion that Ms. Espy had the burden to show

that Mr. Stevens did not have a proper contractor's license, arguing that he could not produce a

document showing the non-existence of such license. *Id*. at 92. Counsel further asserted that Mr.

Stevens neither provided a copy nor documentation of his licensure if it indeed existed. *Id*. at 92-

93. He reiterated that Mr. Stevens's lack of license precluded him from obtaining a permit for the

work, which in turn meant no inspections would follow. *Id*. at 93. As to the burden of proof,

counsel for Ms. Espy maintained that a *prima facie* case of fraud had been made, as the evidence

demonstrated that Mr. Stevens intentionally misrepresented that material fact of his possession of

a contractor's license, upon which Ms. Espy reasonably relied to her detriment. *Id*. at 93-94.

Finally, Ms. Espy's counsel challenged the assertion that Mr. Stevens could not have altered the

invoices following Ms. Espy's signature, especially given that Mr. Stevens's apparently retained the attached carbon copies of the contract. *Id*. at 92-93.

2. Recourse, Damages, and the Award of the General District Court

Counsel for Ms. Espy argued that she suffered significant damage as a result of Mr. Stevens's actions with limited options for relief. *Id*. at 83.  Ms. Espy could not file a claim with the Virginia Contractor Transaction Recovery Fund, as Mr. Stevens was not regulated by the Virginia Department of Professional and Occupational Regulation due to his unlicensed status. *Id*. In addition, Mr. Stevens provided no warranty on his work, leaving Ms. Espy with no option other than to recoup from Mr. Stevens directly what she paid him. *Id*.

While counsel for Ms. Espy conceded that the state court awarded judgment by default, he noted that Mr. Stevens participated in the litigation process throughout but failed to attend the actual trial. *Id*. at 84.  Ms. Espy's counsel maintained that evidence was presented to the state court, but upon inquiry by the Court as to the evidence in the record that the issues of liability and damages were actually litigated in the state court, counsel for Ms. Espy responded:

> Well, Judge, there's none.  Truly, there is no evidence of that.  I understand that.  And that's why we're here with this motion.  And I respect all of that.  I'm not trying to argue contrary to that.  But I just wanted the Court to know that [Mr. Stevens] – [Mr. Stevens] was present in the proceedings, just not at the trial, as he indicated.

*Id*.  Counsel for Ms. Espy iterated that his client had sued Mr. Stevens for the $25,000.00 jurisdictional limit in the state court and, but for such limit, Ms. Espy would have sued for treble damages under the Virginia Consumer Protection Act. *Id*. at 83.  Ms. Espy alleged that Mr. Stevens's actions were "willful and reckless and wrongful." *Id*.  As such, he asserted that "[a]n award of a reasonable attorney's fees and costs would be appropriate," stating that such fees and costs were awarded by the state court and are also permitted under the Virginia Consumer

32

Protection Act. *Id*. at 83-84. Ms. Espy's counsel ultimately requested this Court determine that the full judgment of the state court be deemed nondischargeable. *Id*. at 84.

### III. CONCLUSIONS OF LAW

#### A. No Cause of Action for Conversion

The Complaint twice mentions conversion. In the first instance, Ms. Espy indicated that conversion was among the bases for the relief she sought against Mr. Stevens in state court. Complaint, at 2. Second, Ms. Espy alleged that "Mr. Stevens converted certain building supplies purchased and paid for by Ms. Espy totaling $1,663.58, and further he removed these building supplies from Ms. Espy's home without permission or payment in the nature of conversion." *Id*. at 5. Mr. Stevens did not address the conversion allegations in his Answer. Ms. Espy did not specifically reference conversion during her evidentiary presentation, although she did assert Mr. Stevens's alleged improper removal of certain building materials when he ceased work at her home, which allegations Mr. Stevens contested. *See, e.g.*, Transcript, at 21-22, 33, 71-72.

While conversion can constitute a basis for an exception to discharge under 11 U.S.C. § 523(a) (*see, e.g.*, *KMK Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 635 (Bankr. E.D. Va. 2001) (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934)), the Complaint here failed to plead such cause of action adequately and properly. Federal Rule of Civil Procedure 8(a), incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7008, requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought[.]" Fed. R. Civ. P. 8(a)(2). Here, the Complaint, at best, offers a bare, conclusory statement without any additional, specific factual support or a prayer for relief regarding conversion, which undoubtedly cannot meet the pleading standard under Rule 8. *See ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019) (citing

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) ("Labels, conclusions, recitation of a claim's elements, and naked assertions devoid of further factual enhancement will not suffice to meet the Rule 8 pleading standard."). Therefore, to the extent Ms. Espy has attempted to seek a determination of nondischargeability on the basis of conversion, the Court declines to consider such cause of action for insufficient pleading and inadequate due process provided to Mr. Stevens.

B. No Cause of Action Pursuant to the Virginia Consumer Protection Act

Ms. Espy alleged in her Complaint that Mr. Stevens's actions violated certain subsections of the Virginia Consumer Protection Act (hereinafter, "VCPA"), found in Title 59.1, Chapter 17, of the Virginia Code. *See* Complaint, at 4, 6. Ms. Espy also asserted that her state court action alleged VCPA violations by Mr. Stevens. *Id*. at 2. During closing arguments, counsel for Ms. Espy again asserted that Mr. Stevens's fraudulent actions were contrary to the VCPA. Transcript, at 81. As a result, counsel argued that Ms. Espy was entitled to treble damages and attorney's fees as provided for by the VCPA. *Id*. at 83-84. Mr. Stevens neither admitted nor denied the allegations regarding the VCPA violations in his Answer, nor did his counsel address the matter in his closing argument.

Ms. Espy's scant mention of the VCPA in the Complaint does not adequately plead a separate, specific cause of action under that act; additionally, she made no prayer for judgment in this regard so as to provide sufficient and proper notice to Mr. Stevens of this claim. A plaintiff making a sufficient VCPA claim must demonstrate that a fraudulent act or practice was committed by a supplier in connection with a consumer transaction, with each element having a specific definition and parameters under the statutory scheme. *Vuyyuru v. Wells Fargo Bank, N.A.*, Civil Action No. 3:15CV598-HEH, 2016 WL 356087, at *4 (E.D. Va. Jan. 28, 2016) (citing Va. Code Ann. § 59.1-200); *see* Va. Code Ann. § 59.1-198 (defining "consumer transaction" and "supplier").

34

The Complaint fails to enumerate or specifically address any of these requirements.  Likewise,

Ms. Espy's evidentiary presentation did not focus on these elements.[22]  In the instant case, the

Court again finds that the fundamental notice pleading standards espoused by Federal Rule of Civil

Procedure 8(a) are not met with regard to any claim by Ms. Espy under the VCPA.  *See Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*,

355 U.S. 41, 47 (1957)) (iterating that the underlying purpose of Rule 8 is to "'give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests'").  Without proper pleading

so as to satisfy due process standards, the Court cannot rightly address such claim, to the extent

Ms. Espy seeks such determination.

### C.  Collateral Estoppel Does Not Apply

Though not raised by the parties, the Court must nonetheless address the issue of collateral

estoppel and whether this Court is bound by the decision of the state court, as Ms. Espy's damage

request references the default judgment award of the state court.  *See* Complaint, at 6.  The doctrine

of collateral estoppel is governed in Virginia by the decision rendered in *TransDulles Center, Inc.*

*v. Sharma*, 252 Va. 20 (1996) (hereinafter, "*TransDulles*").  Under the *TransDulles* doctrine, an

issue is precluded from relitigation when four elements are met: (1) the parties are the same as the

prior litigation; (2) the factual issue(s) sought to be litigated must have been actually litigated in

---

[22] To be sure, a portion of Ms. Espy's evidence for her nondischargeability action may overlap with the required evidentiary showing for a VCPA claim,  Indeed, this Court has found that the elements of certain actions under the VCPA are congruent with those required by § 523(a)(2)(A). *See Grey-Theriot v. Quansah* (*In re Quansah*), Adv. No. 10-1260, 2011 WL 1363992, at *3 (Bankr. E.D. Va. Apr. 11, 2011).  Judge Mitchell reached such conclusion based on a substantially more robust record than is present in the instant case, with significantly more evidence regarding the state court proceedings, including the specific basis for the state court judgment.  *Id.* at *1-3. Judge Mitchell invoked collateral estoppel principles in concluding that "the state court judgment conclusively establishe[d] all the elements of nondischargeability under § 523(a)(2)(A)."  *Id*. at *3.  As the Court will discuss *infra*, the record of the state court proceedings here is woefully inadequate to rely on such principles.

the prior action and essential to the prior judgment; (3) the prior action resulted in a valid, final judgment against the party sought to be precluded; and (4) mutuality (that the party invoking issue preclusion would have been bound by the decision had an opposite result been reached). *Hately v. Watts*, 917 F.3d 770, 778 (4th Cir. 2019); *Zeigler v. Delph* (*In re Delph*), APN 19-07024-SCS, 2021 WL 2326332, at *6 (Bankr. E.D. Va. June 7, 2021). Here, the parties are the same as in state court, and the Court is satisfied that the element of mutuality is present. The Court is likewise convinced that the state court's judgment order is valid and final.

The remaining element, concerning the actual litigation of the essential factual issues in the prior matter, is not met here, however. On questioning from the Court, counsel for Ms. Espy readily conceded that there was no evidence in the record that the issues central to the Complaint were actually litigated in the state court. *See* Transcript, at 84. Further, a copy of the judgment award from state court was not exhibited by Ms. Espy, although her counsel alluded to portions of its contents. Given counsel's admission and the lack of evidence of prior litigation in the record, the Court finds that there is no evidence of actual litigation in the state court. Accordingly, this Court is not bound by the state court decision or the judgment amount awarded and will proceed to decide the issues in this case.

D. Nondischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). A plaintiff seeking a determination of nondischargeability due to fraud pursuant to § 523(a)(2)(A) must prove five elements by a preponderance of the evidence in order to succeed on their claim: (1) the debtor

made a representation; (2) the debtor knew the representation was false when he made the representation; (3) the debtor made the false representation with the intent to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained the alleged loss and damages as a proximate result of the debtor making the representation. *Com. Cash Flow, L.L.C. v Matkins* (*In re Matkins*), 605 B.R. 62, 87 (Bankr. E.D. Va. 2019) (quoting *McCoy v. McCoy* (*In re McCoy*), Adv. No. 15-07042-SCS, 2016 WL 4268702, at *9 (Bankr. E.D. Va. Aug. 11, 2016)); *see also Kendrick v. Pleasants* (*In re Pleasants*), 231 B.R. 893, 897 (Bankr. E.D. Va. 1999) (quoting *Grogan v. Garner*, 498 U.S. 279, 288 (1991)), *aff'd*, 219 F.3d 372 (4th Cir. 2000). Courts must narrowly construe exceptions to discharge under § 523 "to protect the purpose of providing debtors a fresh start." *Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493, 497 (4th Cir. 2008) (quoting *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999)).

In cases involving contractor-debtors, a plaintiff generally can prove fraud or misrepresentation by one of two ways. First, fraud or misrepresentation may be shown by demonstrating that the debtor never intended to comply with the terms of the contract when he entered into it. *Webb v. Isaacson* (*In re Isaacson*), 478 B.R. 763, 775 (Bankr. E.D. Va. 2012) (quoting *Scheidelman v. Henderson* (*In re Henderson*), 423 B.R. 598, 622 (Bankr. N.D.N.Y. 2010)); *see also Pennsylvania v. Burns* (*In re Burns*), Adv. No. 5-AP-07-50121, 2008 WL 2782659, at *3 (Bankr. M.D. Pa. July 11, 2008); *Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 150 (Bankr. D. Md. 1999). Fraud or misrepresentation may also be shown where the contractor-debtor intentionally misrepresented a material fact or qualification when soliciting or obtaining work. *In re Isaacson*, 478 B.R. at 775 (quoting *In re Henderson*, 423 B.R. at 622; citing *In re Burns*, 2008 WL 2782659, at *3). "'[W]hen determining whether a contractor committed fraud in connection with a construction project, the question pivots on whether during the

negotiations the contractor induced the property owner into signing the contract by making material false representations, like promising to obtain the necessary permits or overstating his qualifications."' *Id.* (quoting *In re Henderson*, 423 B.R. at 622); *see also In re Pleasants*, 231 B.R. at 901 (concluding that misrepresenting having a professional license can constitute fraud pursuant to § 523(a)(2)(A)).  Fraud does not result solely from "'[s]ubstandard performance or a mere breach of the construction contract.'" *In re Isaacson*, 478 B.R. at 775 (quoting *In re Henderson*, 423 B.R. at 622).

In the instant case, Ms. Espy does not allege that Mr. Stevens did not intend to perform under the contract; rather, she alleges that Mr. Stevens's misrepresentation regarding his status as a licensed contractor fraudulently induced her into contracting with him.  Therefore, the Court will examine the above-enumerated elements as they relate to the alleged representation by Mr. Stevens that he was a licensed contractor.

### 1. Did Mr. Stevens Represent that He Was a Licensed Contractor?

As to the first element of a § 523(a)(2)(A) claim, the Court must determine whether Mr. Stevens represented, as Ms. Espy alleges, that he was a Virginia licensed contractor.  The evidence here plainly shows that Mr. Stevens represented to Ms. Espy that he held a Virginia contractor's license.  The Requests for Admission are particularly instructive as to this element.  Mr. Stevens admitted that he both represented to Ms. Espy that he was a licensed contractor and advertised himself to the public as such.  *See* Requests for Admission numbers 4 and 5, *supra*.  Mr. Stevens also admitted that he gave Ms. Espy his business card, which stated that he was licensed.  *See id.* number 9, *supra*.  Mr. Stevens additionally admitted that Plaintiff's Exhibit 5 is a copy of his business card and that Plaintiff's Exhibit 6 is a copy of his Facebook webpage as published in June

2020.  *See id*. numbers 19 and 21, *supra*.[23]  The bottom of Mr. Stevens's business card indicated

that he was "Insured & Licensed."  Plaintiff's Exhibit 5.  This information was reinforced by Mr.

Steven's business Facebook page, which described his business as a "[f]amily owned and operated

business.  We specialize in all forms of Remodeling and new construction of any kind.  Licensed

and insured.  Free estimates."  Plaintiff's Exhibit 6.  To further bolster the evidence offered via the

Requests for Admission, Ms. Espy amply and credibly testified to the same effect.  *See* Transcript,

at 12, 23-24.

2. Did Mr. Stevens Know (or Should He Have Known) that He Was Not a Licensed Contractor
When He Made Such Representation to Ms. Espy?

To determine the second element of a § 523(a)(2)(A) claim, the Court must discern whether

Mr. Stevens knew or should have known that he did not hold a Virginia contractor's license when

he represented such to Ms. Espy.  *In re Matkins*, 605 B.R. at 88 (citing *OSB Mfg., Inc. v. Hathaway*

(*In re Hathaway*), 364 B.R. 220, 234 (Bankr. E.D. Va. 2007)).  "A misrepresentation consists of

any words or conduct, which produce a false or misleading impression of fact in the mind of

another."  *In re Pleasants*, 231 B.R. at 897.  The evidence here strongly supports a finding in favor

of Ms. Espy.  Mr. Stevens admitted that when he "contracted with [Ms.] Espy and during the time

that work was performed, [he] never held a contractor's license issued by the Commonwealth of

Virginia."  Request for Admission number 11, *supra*.  Thus, the representation to Ms. Espy that

he held such license was patently false.

Mr. Stevens also admitted that he had previously held a Virginia contractor's license.  *See*

*id*. number 10, *supra*.  Further, when Mr. Stevens was hired, he was unaware that Ms. Espy's

project required a contractor's license due to the estimated cost of the project.  Transcript, at 65.

---

[23] Exhibits C and E attached to Ms. Espy's Requests for Admission (ECF No. 29-1, at 1-19) are
identical to Ms. Espy's trial Exhibits 5 and 6.

Finally, Mr. Stevens testified that he held a "Virginia State license" that he obtained "through the city." *Id*. at 51. Taking the evidence together, it is clear to the Court that Mr. Stevens knew or should have known that he was not licensed as a contractor by the Commonwealth of Virginia when he was hired by and performing work for Ms. Espy. Having previously held such license, he was clearly aware of its existence and can be presumed to have understood its import to the trade in which he had worked for twenty-three (23) years. *See id*. at 53. Mr. Stevens's testimony, while somewhat vague, indicates that at best, he held a business license issued by a local municipality, which, as this Court has previously discussed, pertains not to qualifications and competency (the primary indicators resulting from a professional license) but instead is a revenue-raising mechanism for the issuing locality. *In re Isaacson*, 478 B.R. at 778-79. Further, his knowledge of the existence of the city-issued business license coupled with his previous possession of a state-issued contractor's license heavily suggests a level of understanding of the licensure requirements, even if he did not comply with those provisions. Accordingly, the Court concludes that Mr. Stevens either knew or should have known that he did not hold a Virginia contractor's license when he represented to Ms. Espy that he indeed held such license.

3. Did Mr. Stevens Intend to Deceive Ms. Espy Regarding His Licensure Status?

The Court must next determine whether Ms. Espy has proven by a preponderance of the evidence that Mr. Stevens misrepresented that he was a licensed contractor to Ms. Espy with the intent of deceiving her so as to satisfy the third element of her § 523(a)(2)(A) claim. "Since the Court seldom has direct evidence of fraudulent intent, we must usually resolve the question of intent by an examination of surrounding circumstances." *In re Pleasants*, 231 B.R. at 898 (citing *W. Union Corp. v. Ketaner* (*In re Ketaner*), 154 B.R. 459, 465 (Bankr. E.D. Va. 1992)); *see also In re Matkins*, 605 B.R. at 90 (citing *In re McCoy*, 2016 WL 4268702, at *13). Further, "[i]ntent

40

to deceive may be inferred if defendant knowingly or recklessly made false representations, which

he should know will induce another to rely on them." *In re Pleasants*, 231 B.R. at 898 (citing *In*

*re Ketaner*, 154 B.R. at 465); *see also In re Matkins*, 605 B.R. at 90 (quoting *In re Hathaway*, 364

B.R. at 235).  In this context, recklessness "'must exceed negligence and rise to the level of reckless

disregard for the truth.'" *In re Hathaway*, 364 B.R. at 235 (quoting *Parker v. Grant* (*In re Grant*),

237 B.R. 97, 115 (Bankr. E.D. Va. 1999)).  "If a plaintiff adduces circumstantial evidence such

that the Court can infer the debtor intended to deceive, unsupported assertions of honest intent

from the debtor will be insufficient to overcome this inference." *In re Matkins*, 605 B.R. at 90

(citing *In re McCoy*, 2016 WL 4268702, at *13); *see also In re Ketaner*, 154 B.R. at 465.  The

Court must therefore review the facts and circumstances surrounding Mr. Stevens's

misrepresentation concerning his licensure status to determine if it was made with the requisite

intent to deceive Ms. Espy and induce her to contract with him.

Mr. Stevens admits that he held a contractor's license prior to January 1, 2020.  Request

for Admission number 10, *supra*.  He further admitted to holding himself out as a licensed

contractor, both to Ms. Espy specifically and the public generally, despite possessing no such

license. *Id*. numbers 4, 5, 9, 11, *supra*.  Mr. Stevens claimed twenty-three (23) years of experience

in the home improvement industry, albeit most of which involved working for other companies.

Transcript, at 53.  The Court can easily infer that, with such lengthy experience, Mr. Stevens knew

or should have known that homeowners, like Ms. Espy, desire their home improvement projects

to be completed by competent, qualified, and properly licensed tradespeople. *See In re Pleasants*,

231 B.R. at 898.  That Mr. Stevens held himself out as a licensed contractor demonstrates that he

understood the importance of such qualification to homeowners and made such representation to

obtain contracting work. *See id*. (finding that the debtor intentionally and falsely held himself out

as an architect to secure business in that field).  Instead of ensuring he was properly licensed for

the work he was undertaking as part of his proclaimed "learning . . . the ropes of everything," Mr.

Stevens focused on customer satisfaction.   Transcript, at 65.   Misrepresenting the critical

qualification of his licensure constituted reckless behavior by Mr. Stevens, as he had "no regard

for whether it [was] true or false." *Fleming v. Gordon* (*In re Gordon*), 491 B.R. 691, 701 (Bankr.

D. Md. 2013).  The evidence on the record leads the Court to conclude that Mr. Stevens intended

to deceive Ms. Espy when he represented that he was a licensed contractor.   Mr. Stevens's

entreaties that he did not intend to deceive Ms. Espy are unavailing and wholly fail to overcome

the Court's conclusion that Mr. Stevens intended to, and did in fact, deceive Ms. Espy.   *See*

Transcript, at 63; *In re Matkins*, 605 B.R. at 90; *In re McCoy*, 2016 WL 4268702, at *13; *In re

Ketaner*, 154 B.R. at 465.

### 4.  Did Ms. Espy Justifiably Rely on Mr. Stevens's Representation?

The fourth element that the Court must determine under the § 523(a)(2)(A) analysis is

whether Ms. Espy demonstrated that she justifiably relied on Mr. Stevens's representation that he

was a licensed contractor.  *In re Pleasants*, 231 B.R. at 898 (citing *Field v. Mans*, 516 U.S. 59, 70

(1995)).  Justifiable reliance, as opposed to reasonable reliance, considers "'the qualities and

characteristics of the particular plaintiff, and the circumstances of the particular case, rather than

of the application of a community standard of conduct to all cases.'"  *Field*, 516 U.S. at 71 (quoting

Restatement (Second) of Torts (1976), § 545A, cmt. b).  As this Court has previously found,

however, justifiable reliance is not without its limitations.  "A creditor cannot prove justifiable

reliance by a preponderance of the evidence if he has relied on obvious falsities" or failed to

investigate in the face of warning signs or "red flags."  *In re Matkins*, 605 B.R. at 94 (citing *In re

Hathaway*, 364 B.R. at 236; *Dominion Va. Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 348

(Bankr. E.D. Va. 2006)).   Justifiable reliance cannot be found if "the falsity of [a misrepresentation] would be patent to [the creditor] if he had utilized his opportunity to make a cursory examination or investigation[.]"  *Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts (1976), § 545A, cmt. a).  Further, the creditor must be "'capable of appreciating its falsity at the time by the use of his senses.'"  *Id*.

The Court finds that there is more than abundant evidence to show that Ms. Espy justifiably relied upon Mr. Stevens's representation that he was licensed.  Ms. Espy testified credibly at trial that Mr. Stevens's licensure was critically important in her decision to contract with him.  Transcript, at 12.  Ms. Espy considered professional licensure to be important because she "wanted to make sure somebody knew what they were doing.  And also, that my house will be for sale in about five years, so I wanted it to be done correctly for the resale value."  *Id*.  Thus, she sought a licensed contractor to complete her home improvements to ensure the quality of the workmanship, the competency of the contractor, and the enhanced value of her home post-completion.  *See id*.  Mr. Stevens's licensure representation was supported by both his business card and webpage, which she had no reason to believe contained false information.  *Id*.  Ms. Espy's failure to insist that Mr. Stevens produce a copy of his license is not fatal here, particularly since the evidence does not show any warning signs or "red flags" that should have prompted her further investigation into his qualifications.

The matter at hand is similar to a case relied upon by *In re Pleasants*, *In re Fuselier*.  In the latter, the United States Bankruptcy Court for the Western District of Louisiana held that a debt owed by a contractor-debtor was nondischargeable pursuant to § 523(a)(2)(A).  *McCain v. Fuselier* (*In re Fuselier*), 211 B.R. 540, 545 (Bankr. W.D. La. 1997).  The *Fuselier* Court found that the plaintiffs justifiably relied on the contractor-debtor's representation that he was licensed: "The

presentation of a contractor's license number of the project proposal is sufficient for the [plaintiffs]

to expect the Debtor was a competent contractor, and was in fact licensed.  Nothing the Debtor

said or did prior to the signing of the contract would raise any reason for the [plaintiffs] to check

his qualifications." *Id*. at 544.  Here, as in *Fuselier*, Mr. Stevens represented to Ms. Espy that he

was a licensed contractor, and Ms. Espy justifiably relied on that representation in deciding to

contract with him.  Ms. Espy did not perceive anything that caused her to question the validity of

Mr. Stevens's licensure or representation of such, just as in *Fuselier*.  Accordingly, the Court finds

that Ms. Espy has proven, by a preponderance of the evidence, that she was justified in relying

upon Mr. Stevens's representation concerning his licensure status, thus satisfying the fourth

required element here.

     5.  Was Mr. Stevens's Misrepresentation a Proximate Cause of Ms. Espy's Damages?

     As Ms. Espy has proven the first four required elements of her claim under 11 U.S.C. §

523(a)(2)(A), the Court must now determine if she also has shown by a preponderance of the

evidence that her damages were a proximate result of Mr. Stevens's misrepresentation.  The

proximate cause analysis requires proof of both "(1) causation in fact, 'loss suffered by one who

justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor

in determining the course of conduct that results in his loss;' and (2) legal causation, 'if the loss

might reasonably be expected to occur from the reliance.'"  *KMK Factoring, L.L.C. v. McKnew*

(*In re McKnew*), 270 B.R. 593, 622 (Bankr. E.D. Va. 2001) (quoting Restatement (Second) of

Torts §§ 546, 548A); *see also Wickam v. Ivar* (*In re Werner*), 817 F. App'x 432, 437 (9th Cir.

2020); *Gem Ravioli, Inc. v. Creta* (*In re Creta*), 271 B.R. 214, 218-19, 221-22 (B.A.P. 1st Cir.

2002); *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 117 (Bankr. E.D. Va. 1999); *Shannon v. Russell*

(*In re Russell*), 203 B.R. 303, 313 (Bankr. S.D. Cal. 1996).  "'If the misrepresentation has in fact

induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in

the transaction[,]'" so long as "'the representation played a substantial part . . . in influencing the

decision.'"  *In re Creta*, 271 B.R. at 219 (quoting Restatement (Second) of Torts § 546).  In cases

involving a false representation concerning professional licensure, a plaintiff can "establish

causation in fact through evidence demonstrating that the Debtor's false statement regarding the

license in fact induced [the plaintiff] to enter into the contract and that the misrepresentation was

a substantial factor in influencing [the plaintiff]'s decision to hire the Debtor to perform the work."

*Id*.

However, only those "'pecuniary losses that are within the foreseeable risk of harm that

[the misrepresentation] creates'" rise to the level of being legally caused by the misrepresentation.

*Id*. (quoting Restatement (Second) of Torts § 548A).  When evaluating legal causation, "'the matter

misrepresented must be considered in the light of its tendency to cause those losses and the

likelihood that they will follow . . . .   In determining what is foreseeable as a result of the

misrepresentation, the possibility of intervening events is not to be excluded altogether.'"  *Id*.

(quoting Restatement (Second) of Torts § 548A cmts. a and b).  Where a contractor misrepresents

attributes concerning the skill and competency to complete specified projects prior to being hired,

"there can be little question that defective work is foreseeable if the Debtor does not have the

qualifications that would be required" of a properly trained professional.  *Id*. at 222.

Nondischargeability cases involving contractors misrepresenting their professional license

status focus largely on the damages that result from their lack of skill and qualification to perform

the work for which they were hired.  *See, e.g.*, *In re Pleasants*, 231 B.R. at 899, 901; *In re Fuselier*,

211 B.R. at 544-45; *Peterson v. Bozzano* (*In re Bozzano*), 173 B.R. 990, 996 (Bankr. M.D.N.C.

1994), *abrogated on other grounds by Cohen v. de la Cruz*, 523 U.S. 213 (1998).  "Professional

licenses carry with them a degree of presumed competence[.]" *In re Pleasants*, 231 B.R. at 898.

As summarized by the *Creta* Court, "when an individual asserts that he possesses a . . . license, . . . he is making a representation that he possesses the necessary level of skill and knowledge to perform" work in the field in which he holds such license. *In re Creta*, 271 B.R. at 220. Logically, then, "[a] misrepresentation as to whether a debtor has such a license goes to the very essence of the agreement, *i.e.*, the reliance by the contracting party that the debtor has the requisite knowledge, experience, and training to properly complete the work." *Id*. (citing *In re Grant*, 237 B.R. at 119); *see also In re Pleasants*, 231 B.R. at 898; *Bottari v. Baiata* (*In re Baiata*), 12 B.R. 813, 820 (Bankr. E.D.N.Y. 1981). When such false representation is a "substantial factor" that induces a creditor to enter into an agreement, if "the debtor's work later appears defective, and the creditor suffers a loss, the creditor has established a *prima facie* case that the defects derive directly from the lack of professional qualifications of the debtor." *In re Creta*, 271 B.R. at 220 (citing *In re Grant*, 237 B.R. at 119; *In re Pleasants*, 231 B.R. at 893).

The often-relied upon *In re Pleasants* typifies those decisions and parallels the events in the instant case. There, the homeowners discovered that the debtor, with whom they had contracted for construction of an addition and renovations to their home, was not a licensed architect as the debtor had led them to believe. *In re Pleasants*, 219 F.3d at 374. Affirming the decisions of this Court and the United States District Court for the Eastern District of Virginia, the Fourth Circuit Court of Appeals held that the "[debtor's] fraud caused the [homeowners] no end of trouble and expense[;]" "it was precisely 'because [the debtor] misrepresented his credentials, thereby inducing the [homeowners] to hire an unqualified firm,' that the [homeowners] suffered the damages they did." *Id*. at 375 (quoting *In re Pleasants*, 231 B.R. at 896 n.4, 899 & nn.11-13). Those nondischargeable damages, to which the parties stipulated, included "the cost of repairing

[the debtor]'s inadequate work and completing the project, living expenses incurred by the [plaintiffs'] family when they were forced out of the house for over three years, certain attorneys' fees and punitive damages[.]"  *In re Pleasants*, 231 B.R. at 899 n.11 (citing *Cohen*, 523 U.S. at 219-21).

Another congruous example is found in *In re Bozzano*, where the debtor-contractor made numerous false and misleading statements to the plaintiffs regarding his qualifications and competency as well as the quality of the construction of the plaintiffs' new home. *In re Bozzano*, 173 B.R. at 993-94. The plaintiffs discovered several significant latent construction defects with their home, which "established, because of their number and magnitude, that [the debtor-contractor] was not qualified to be the general contractor for a large residence of the type involved in this case[.]" *Id*. at 994. The Court found that the debtor's conduct in that case constituted false representations and false pretenses pursuant to Section 523(a)(2)(A) and entitled the plaintiffs to a nondischargeable damages judgment for expenses incurred to correct the resulting defective work, including related labor and materials. *Id.* at 995-96.

The Court concludes that Ms. Espy has demonstrated by a preponderance of the evidence that Mr. Stevens's misrepresentation regarding his licensure status was the proximate cause of her damages. As in *Bozzano*, Mr. Stevens gave Ms. Espy the impression and assurance that he was qualified to complete her home renovations by misrepresenting his status as a licensed contractor. *See id*. at 994. His licensure status was a paramount consideration for Ms. Espy to ensure that the work was completed correctly and would positively affect the value of her home. Transcript, at 12. The misrepresentation regarding his license was undoubtedly a "substantial factor" in setting in motion the series of events resulting in Ms. Espy's financial loss. *See In re Creta*, 271 B.R. at 219; *In re McKnew*, 270 B.R. at 622. Ms. Espy's justifiable reliance on Mr. Stevens's

misrepresentation precluded her from instead securing a legitimate, licensed, and skilled contractor to renovate her home. *In re Creta*, 271 B.R. at 218 (finding that the debtor's fraudulent misrepresentation concerning his licensure status "deprived [the plaintiff] of the opportunity to contract with a qualified . . . technician"). Accordingly, Ms. Espy has shown causation in fact.

Further, her manifest damages (more specifically discussed *infra*) were certainly and reasonably expected to follow from her justifiable reliance on Mr. Stevens's misrepresentation, thus satisfying the legal causation portion of the proximate cause requirement. As in *Creta* and numerous other cases, Mr. Stevens's defective work was unquestionably foreseeable given his lack of proper licensure and qualification. *See In re Creta*, 271 B.R. at 220 (citing *In re Grant*, 237 B.R. at 119; *In re Pleasants*, 231 B.R. at 893). That Mr. Stevens was not qualified to perform the work for which he was hired is borne out by Mr. Thomas's expert testimony that the completed work did not meet city building code requirements. Transcript, at 37. Mr. Thomas cited significant construction defects, including improper support for the floor joists (*id*. at 37, 41-42); failure to install the exterior wall that replaced the garage door on a continuous footing (*id*. at 37-38); and failure to obtain proper construction permits (*id*. at 40). Mr. Thomas concluded, as a result of these significant deficiencies, that the totality of Mr. Stevens's work needed to be removed and replaced. *Id*. at 38. Mr. Stevens's self-serving claims that he is familiar with building standards (*id*. at 53); that the floor joists were properly constructed (*id*. at 53-54); and that the replacement wall's construction was consistent with methods used by his prior employers (*id*. at 54) do not overcome Mr. Thomas's expert testimony or the other evidence submitted by Ms. Espy. Therefore, having found that Ms. Espy has proven both causation in fact and legal causation of the damages she suffered as a result of Mr. Stevens's misrepresentation, Ms. Espy is entitled to judgment for her damages and have the total sum declared nondischargeable in this matter.

In her Complaint, Ms. Espy's references the $25,000.00 state court judgment as the total amount of her damages that should be excepted from Mr. Stevens's discharge.  Complaint, at 6.  As discussed *supra*, the Court is not bound by the state court judgment amount because the requirements of collateral estoppel have not been sufficiently demonstrated.  Thus, the Court must decide the amount necessary to compensate Ms. Espy for her loss.

### i.  Monies Paid to Mr. Stevens

Ms. Espy's predominant damages claim results from the three payments she made directly to Mr. Stevens for the renovations to her home, all of which had to be removed as Mr. Thomas testified; therefore, Ms. Espy received no value for the services rendered by Mr. Stevens.  Mr. Stevens admitted that Ms. Espy paid him $7,640.00 on June 29, 2020, and $625.00 on July 10, 2020, both of which were by check.  *See* Requests for Admission numbers 12 and 13, *supra*; Plaintiff's Exhibit 1.  Ms. Espy exhibited a third receipt indicating that a $3,100.00 credit card payment was made to Mr. Stevens, also on July 10, 2020.  Plaintiff's Exhibit 1.

Mr. Stevens neither directly challenged nor attempted to rebut evidence of the $3,100.00 payment; rather, his testimony, in essence, is that the invoices accurately reflect the details of his transactions with Ms. Espy.  *See* Defendant's Exhibit 4.  Upon consideration of the totality of the evidence submitted, the Court concludes that Mr. Stevens's testimony is not credible given Ms. Espy's contradictory receipts.  Mr. Stevens's June 29, 2020 invoice references two deposit amounts, $7,640.00 and $2,600.00.  Defendant's Exhibit 4, at 1.  While there is no controversy regarding the $7,640.00 payment, neither party has exhibited any documentation substantiating a $2,600.00 payment.  Further, the second invoice in Mr. Stevens's Exhibit 4 sets forth a $1,125.00 deposit made on July 10, 2020.  *Id.* at 2.  Ms. Espy's receipts indicate two payments were indeed made that day, but neither are in that amount.  *See* Plaintiff's Exhibit 1 (receipts dated July 10,

2020, for $625.00 and $3,100.00).  The Court therefore concludes that Ms. Espy directly paid Mr.

Stevens deposits totaling $11,365.00, representing actual damages proximately caused by Mr.

Stevens's misrepresentation.   Accordingly, as Ms. Espy has met the requirements for a

determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A), the Court will enter

judgment against Mr. Stevens in favor of Ms. Espy for that amount and will deem this amount

nondischargeable in Mr. Stevens's bankruptcy case.

    ii.  Construction Materials Allegedly Taken by Mr. Stevens Upon His Departure

    Ms. Espy alleges that when he ceased work, Mr. Stevens took from her property certain

building materials that she purchased for the renovations Mr. Stevens was to perform.  She asserts

that thirteen boxes of flooring, as well as sheetrock, plywood, window trim, baseboards, and

insulation, were among the items taken.  Transcript, at 20-22, 33.  Other than the flooring, Ms.

Espy provided no quantities, descriptions, or specific prices of the materials.  *See id.* at 14

(representing the flooring cost as $1,300.00 and referencing Plaintiff's Exhibit 2, a check in that

amount); *see also id.* at 77 (indicating that the flooring was delivered to her home).  Mr. Stevens

admitted that the receipts comprising Ms. Espy's Exhibit 4 set forth materials that Ms. Espy

purchased for her renovation and that he "incorporated in the construction, or otherwise removed

. . . and did not return to" Ms. Espy those materials when the working relationship ceased.  *See*

Request for Admission number 20, *supra*.[24]

    Mr. Stevens confirmed at trial that he took some building materials with him when work

at Ms. Espy's home ceased but denied that she purchased the materials he took.  Transcript, at 71-

---

[24]   The receipts in Plaintiff's Exhibit 4 are identical to Exhibit D referenced by Request for
Admission number 2 and are described *supra*, Section II.B.3.

72.  When Ms. Espy's counsel posed questions to Mr. Stevens regarding the disposition of the

flooring, he responded:

> The only thing (*sic*) I took were the things that I had purchased that were in
> with the final bill that she refused to pay.  Besides that, there was sheetrock and
> studs that were left, that she purchased.  There were a few things she purchased
> when I got the additional -- when we added on the additional work.  Besides that,
> everything else I had purchased.  And the only thing that was tooken (*sic*), were the
> things that I did.  I left the sheetrock and the other studs that she purchased, were
> left in that home.  I did not take what she had purchased.

*Id*. at 71.  *See also id*. at 72 (similar testimony).  Mr. Stevens thus seems to believe that he in fact

purchased the flooring for Ms. Espy's project.

Ms. Espy's evidence belies this point.  While Mr. Stevens may have physically visited the

flooring vendor to order or otherwise purchase the flooring, Ms. Espy's testimony along with her

Exhibit 2 convinces the Court that Ms. Espy supplied the funds with which Mr. Stevens purchased

the flooring.  As the flooring was not installed in Ms. Espy's home, the Court finds that the flooring

was Ms. Espy's property; that Mr. Stevens removed the flooring from her home; and that Ms. Espy

should be awarded damages in the amount of $1,300.00, representing the purchase price of the

flooring, as additional actual damages proximately caused by Mr. Stevens's misrepresentation.

Ms. Espy purchased the flooring as a direct result of her reliance upon his misrepresentation.  The

Court finds it is reasonably foreseeable that, as a result of her reliance, Ms. Espy would advance

funds to pay for building materials for the project.  Mr. Stevens never installed the flooring, and

even if he had (and assuming it was installed correctly), its removal would be certain based upon

Mr. Thomas's testimony concerning the improperly constructed floor joists.  Accordingly, the

Court shall enter judgment against Mr. Stevens in favor of Ms. Espy for this additional amount

and will deem such amount nondischargeable in Mr. Stevens's bankruptcy case.

The Court is unable to discern either the identity or nature of some of the purchased items on the seven (7) receipts in Ms. Espy's Exhibit 4.  Ms. Espy's testimony was not illuminating in this regard.  The compound nature of Request for Admission number 20 provides no assistance. The evidence is simply insufficient to permit the Court to make further award to Ms. Espy for any items she alleges Mr. Stevens took from her property.

### iii.  Removal of Items Constructed by Mr. Stevens

Ms. Espy and Mr. Thomas both testified that all items installed by Mr. Stevens had to be removed due to the installation methods being non-compliant with city building codes and the lack of permitting.  *Id*. at 19, 22, 37-38.  Based upon the report from the City of Hampton, Virginia's office of codes compliance, Ms. Espy told city representatives that the unpermitted work would be removed.  Plaintiff's Exhibit 8, Report from City of Hampton, Virginia Codes Compliance, at 1.  Indeed, by the time of trial, Ms. Espy represented that all of Mr. Stevens's work had been removed, with the exception of the exterior work, which she still intended to replace.  Transcript, at 19.  However, Ms. Espy provided no evidence or testimony regarding costs, either incurred or anticipated, to remove Mr. Stevens's work and dispose of the items.  Mr. Thomas indicated that Ms. Espy would incur labor and disposal expenses for removing the items installed by Mr. Stevens but gave no dollar amount for doing so.  *Id*. at 38-39.  Mr. Thomas did note, however, that the cost for removal would be less than the cost to repair the work completed by Mr. Stevens.  *Id*. at 37. The Court finds Mr. Thomas's testimony, as a qualified and unobjected-to expert witness in the field, to be more credible than Mr. Stevens's self-serving and unsupported statements that his work conformed with construction standards.  *Id*. at 53-54.

Case law supports an award of damages where a contractor's fraud leads to additional expenditure by the homeowner to correct the work.  The Court in *In re Pleasants* found that the

homeowners' damages, as agreed to by the debtor, "appropriately include[d] the cost of repairing [the debtor]'s inadequate work[.]"  *In re Pleasants*, 231 B.R. at 899 n.11.  Such damage award embodies the broad reasoning articulated in *Cohen v. de la Cruz*, 523 U.S. 213 (1998), which ensures that a creditor is fully compensated for all losses arising from the debtor's fraudulent behavior.  *Id.* at 222.  There, the United States Supreme Court, taking the statutory language of both Section 523(a)(2)(A) and parallel statutory provisions into account, along with the historical underpinnings and general policy of excepting from discharge those debts resulting from fraudulent behavior, concluded that any and all debts arising from fraud are nondischargeable.  *Id.* at 223 (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

While the cost of removal of Mr. Stevens's improperly constructed and installed items falls under the umbrella of potential damages as expressed by *Cohen*, neither that case nor its progeny dispense with the evidentiary requirement for proving such damages.  Here, without any evidence as to the damages sustained for removing and disposing of Mr. Stevens's work, the Court declines to award any sum.

### iv.  Payments to Other Tradespeople

Ms. Espy paid an electrician $800.00 and a plumber an unspecified amount separate from her payments to Mr. Stevens.  *See* Transcript, at 14-15, 27; Plaintiff's Exhibit 3.  While Mr. Stevens admitted that the contract included electrical work (Request for Admission number 3, *supra*) and Ms. Espy believed the contract price included this aspect of the project (Transcript at 14), Ms. Espy contracted directly with the electrician.  *See* Transcript, at 14-15.  The parties' opinions diverge as to payment responsibility for the plumber, with Mr. Stevens indicating that Ms. Espy bore the responsibility because such services were beyond the project's initial scope (Transcript,

at 59) and Ms. Espy believing such work would be included in the total amount to be paid to Mr. Stevens (*id*. at 14-15, 31).

As explained above, the *Cohen* decision permits recovery for any debt arising from fraudulent activity, not solely amounts paid to fraudulent debtors, so as to fully compensate plaintiffs who fall victim to such behavior.  Ms. Espy has provided no evidence regarding the amount she paid separately for plumbing services, the Court declines to award any sum for such expenditure as Ms. Espy has failed to carry her evidentiary burden.  Further, the Court cannot find that Ms. Espy has satisfied her burden of proving that the cost incurred for the electrician was caused, both legally and in fact, by her reliance upon Mr. Stevens's misrepresentation.  While she retained the electrician's services as part of the larger project Mr. Stevens was to complete, neither Ms. Espy nor Mr. Thomas provided any testimony or other evidence that the electrical items had to be removed.  Rather, the focus of their testimony in that regard was on solely those items constructed by Mr. Stevens.  To be sure, Mr. Thomas testified that permits should have been obtained for the electrical work.  *Id*. at 40.  That evidence alone, though, is insufficient to permit Ms. Espy to recover from Mr. Stevens the sum she paid to the electrician.

### v.  Punitive Damages

In addition to actual damages, this Court has jurisdiction and the discretion to consider whether punitive damages are appropriate in dischargeability actions.  *Harmon v. Scott* (*In re Scott*), 203 B.R. 590, 599 n.17 (Bankr. E.D. Va. 1996) (citing *Lisk v. Criswell* (*In re Criswell*), 44 B.R. 95, 97-98 (Bankr. E.D. Va. 1984)); *see also Levy v. Runnells* (*In re Landbank Equity Corp.*), 83 B.R. 362, 382 (E.D. Va. 1987) (citing *Lisk v. Criswell* (*In re Criswell*), 52 B.R. 184, 205 (Bankr. E.D. Va. 1984)).  "Where the Bankruptcy Code does not specifically provide for an award of punitive damages, the Court may award such by application of state law." *In re Landbank Equity*

*Corp.*, 83 B.R. at 382 (citing *In re Criswell*, 52 B.R. at 205).  As the doctrine of *lex loci delicti* applies in the instant matter, the governing state law is that of the Commonwealth of Virginia, as the fraudulent conduct and resulting harm both occurred here.  *Wood v. Southside Physician Network, LLC*, Civil No. 3:19cv144, 2019 WL 3416665, at *5 (E.D. Va. July 29, 2019) (quoting *Jordan v. Shaw Indus., Inc.*, No. 96-2189, 1997 WL 734029, at *3 (4th Cir. Nov. 26, 1997)) (explaining that in Virginia, the place of the wrong determines the applicable substantive law, and "[i]n the fraud context, 'the place of the wrong is where the loss is sustained.'").  Virginia permits the assessment of punitive damages for common law fraud "only upon 'proof, either direct or circumstantial, showing actual malice.'  'Actual malice' has been defined as 'ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another.'"  *Adkins v. Crown Auto, Inc.*, 488 F.3d 225, 234 (4th Cir. 2007) (quoting *Jordan v. Sauve*, 219 Va. 448, 452-53 (1978)).  Punitive damages serve as "'protection [for] the public, as a punishment to defendant, and as a warning and example to deter him and others from committing like offenses.'"  *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 695 (E.D. Va. 1990) (quoting *Baker v. Marcus*, 201 Va. 905, 909 (1960)).

Ms. Espy neither requested a specific award of punitive damages from this Court nor does it appear from the record that such damages were requested in the state court.  *See* Complaint, at 2.  Ms. Espy's counsel argued, however, that Mr. Stevens engaged in "willful and reckless and wrongful" conduct as well as "trickery and fraud."  Transcript, at 83.  Even if the Court interpreted Ms. Espy's prayer or her counsel's argument as requesting the imposition of punitive damages, the Court would decline to invoke the discretion to so assess them.  Based upon the evidence presented by the parties, the Court cannot conclude that Mr. Stevens acted with any "ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of" Ms. Espy's rights.

Certainly, the working relationship between the parties did not end amicably and resulted in both parties seeking legal redress in the state court. The parties are both steadfast in their beliefs as to the wrongs committed by the other. The recordkeeping by both parties demonstrates shortcomings that perhaps contributed to the breakdown of the transaction. However, not all findings of fraudulent activity that are subject to remuneration for actual damages entitle the victim to punitive damages, as is evidenced by the higher standard of proof required for such award. Ms. Espy has not met her burden in this regard, and therefore, no punitive damages will be awarded here.

### vi. Treble Damages

Ms. Espy's counsel indicated that she would have sued for treble damages in the state court action, as permitted under the VCPA, but for the jurisdictional limit of the state court. *Id*. at 83. There is no provision for the award of treble damages in nondischargeability actions under the Bankruptcy Code. Further, this Court has already determined, *supra*, that Ms. Espy failed to adequately plead a cause of action under the VCPA. Assuming *arguendo* that a separate cause of action under the VCPA was properly plead, the Court would decline to invoke the discretion set forth in Virginia Code Ann. § 59.1-204(A), which indicates the Court "may" triple the damages amount for a violation of that act. Such specific request was not made in the Complaint, and under any circumstances, the Court finds that an award of treble damages here is not justified.

### vii. Attorney's Fees and Costs

Ms. Espy represented that the state court judgment included an award of attorney's fees of $6,250.00 and costs of $76.00. Complaint, at 2. Her counsel reiterated the request for attorney's fees during his closing argument, asserting that such fees were both awarded by the state court and are allowed under the Virginia Consumer Protection Act. Transcript, at 83-84. As explained

earlier, this Court was not supplied with a copy of the state court judgment and is not bound by its conclusions based upon the record presented.

Ms. Espy presented no evidence as to the amount of attorney's fees she has incurred, save the unsupported statement contained in the Complaint.  Further, Ms. Espy did not request that the Court defer ruling on her entitlement to attorney's fees pending the submission of evidence following a favorable ruling on her Complaint.  Similar to the Court's conclusion regarding treble damages, there is also no basis under the VCPA for the Court to award attorney's fees, as a cause of action under that Act was not properly plead.  Even had such cause been properly plead, the Court would decline to invoke the statutorily-based discretion to award attorney's fees.  *See* Va. Code Ann. § 59.1-204(B).  Moreover, the denial of the award of attorney's fees here is controlled by the "American Rule," which dictates that prevailing parties in Virginia are not entitled to recover their attorney's fees unless an independent statutory or contractual basis exists for such award.  *See Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-53 (2010)); *Hilgartner v. Yagi*, 643 B.R. 107, 120 (E.D. Va. 2022) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967)); *Lawrence v. Combs (In re Combs)*, 543 B.R. 780, 797 (Bankr. E.D. Va. 2016) (discussing the American Rule in the context of nondischargeability actions).  No statutory basis exists, under either Virginia state law or the Bankruptcy Code, to award attorney's fees here.  Further, there is no demonstrated contractual basis present for such award in the current context.  Therefore, Ms. Espy is not entitled to an award of attorney's fees in this matter.

## IV.  CONCLUSION

The Court finds that Ms. Espy has satisfied her burden to show by a preponderance of the evidence that: (1) Mr. Stevens made a  representation concerning his status as a licensed contractor; (2) he knew or should have known the representation was false at the time he made it; (3)  he made the representation with the intent to deceive Ms. Espy; (4) Ms. Espy reasonably relied on Mr. Stevens's misrepresentation; and (5) she suffered damages that were a proximate result of Mr. Stevens's misrepresentation.   The testimony of Ms. Espy and Mr. Thomas, coupled with the admissions of Mr. Stevens, clearly show that Ms. Espy satisfied the elements of § 523(a)(2)(A). Mr. Stevens did not present the Court with sufficient evidence to rebut these findings. Accordingly, the Court finds that Ms. Espy is entitled to judgment against Mr. Stevens in the total amount of $12,665.00 and that such amount is nondischargable pursuant to 11 U.S.C. § 523(a)(2)(A).

The Court will enter a separate Order consistent with the findings and conclusions in this Memorandum Opinion.

The Clerk shall transmit a copy of this Memorandum Opinion to the Plaintiff, Tina Espy; Irving B. Goldstein, counsel for the Plaintiff; the Debtor and Defendant, Michael A. Stevens; and Nathaniel Webb, counsel for the Defendant.

IT IS SO ORDERED.

Entered in the Eastern District of Virginia on this 25th day of October, 2022.

Oct 25 2022

/s/ Stephen C St-John
_____
STEPHEN C. ST. JOHN
United States Bankruptcy Judge

NOTICE OF JUDGMENT OR ORDER
ENTERED ON DOCKET: Entered On Docket:  Oct 25 2022